**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, et al., Defendants.**

**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**SABENA, BELGIAN WORLD AIRWAYS, et al., Defendants.**

**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**UNION DE TRANSPORTS AERIENS, et al., Defendants.**

**Civ. A. Nos. 82–3362, 83–0416 and 83–2791.**

United States District Court, District of Columbia.

June 26, 1984.

See also 103 F.R.D. 42, and 731 F.2d 909.

Robert M. Beckman, Beckman & Farmer, Carl W. Schwarz, Metzger, Shadyac & Schwarz, Washington, D.C., for plaintiff.

Fred D. Turnage, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Pan American World Airways.

Leonard N. Bebchick, Douglas E. Rosenthal, Sutherland, Asbill & Brennan, Washington, D.C., for British Caledonian Airways.

James J. Murphy, Bryan, Cave, McPheeters & McRoberts, Washington, D.C., for McDonnell Douglas Corp., McDonnell Douglas Finance Corp.

George T. Manning, Chadbourne, Parke, Whiteside & Wolff, Washington, D.C., for Trans World Airlines.

Lloyd Cutler, Wilmer, Cutler & Pickering, Laurence A. Short, Short, Klein & Karas, Washington, D.C., for Lufthansa German Airlines, Swissair, Swiss Air Transport Company Limited.

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., for British Airways Bd.

Bert Rein, P.C., Washington, D.C., for Intern. Air Transport Ass'n.

Peter J. Nickles, Covington & Burling, Washington, D.C., for Societe Anonyme Belge D'Exploitation de la Navigation Aerienne (Sabena).

Robert V. von Mehren, R.C. Ferrara, Debevoise & Plimpton, Thomas Whalen, Condon & Forsyth, Washington, D.C., for KLM Royal Dutch Airlines.

Sanford C. Miller, Haight, Gardner, Poor & Havens, Washington, D.C., for Union de Transports Aeriens.

Robert R. Gray, Hale Russell & Gray, Washington, D.C., for Scandinavian Airlines System.

Stephen J. Pollak, Shea & Gardner, Washington, D.C., amicus curiae.

## OPINION

HAROLD H. GREENE, District Judge.

This is a motion to disqualify plaintiff's counsel. Several of the defendants [1] have cited various incidents in the past career of Donald A. Farmer, Esq. which they claim give rise to his disqualification from his current representation of Laker.[2] There is no question that Farmer, both during his government service and in private practice,

1. British Airways Board (British Airways), British Caledonia Airways Ltd., Deutsche Lufthansa Akt. (Lufthansa), Swissair, Swiss Transport Company (Swissair), Pan American World Airways, Inc. (Pan Am), and Trans World Airlines, Inc. (TWA).

2. Defendants claim that consequently all other members of Beckman & Farmer, the law firm

in which Farmer is a partner, must also be disqualified, as well as the law firm of Metzger, Shadyac & Schwarz, co-counsel for Laker in this case. Because of the Court's disposition of the motion to disqualify with regard to Farmer, it need not address the issue of the disqualification of other members of Farmer's firm and of co-counsel.

has specialized in the areas of law involved in the instant lawsuit. He has also encountered or had contact with the parties to this lawsuit, both in a regulatory capacity and as a private attorney. One way to look at the issues raised by the motion would be to assume that with this kind of experience and specialization, there must be something in Farmer's career to disqualify him now. But when his relationships are examined in detail, it becomes apparent that defendants' charges do not require disqualification.[3]

## I

Before discussing the specific facts, it is appropriate to relate some of the applicable policy considerations.

■ It is true, of course, that where there are conflicts of interest, the particular attorney or attorneys must be ordered disqualified. Conflicts of interest by attorneys give rise to many substantive evils (*e.g.,* unfair advantage in litigation, neglect of duties to the client) and they tend to diminish the bar's image in the mind of the public. But the mere claim of a conflict is not enough; there must be proof. Moreover, the Court must make its decision[4] in the interest of justice to all concerned,[5] and it must balance the need to ensure proper conduct on the part of lawyers appearing before it against the harm to other social interests which may ensue if disqualification is improvidently granted.[6] There are several such competing interests in this case.

■ First. A litigant has a right to freely chosen, competent counsel.[7] The protection of that right is particularly important in this case, where the attorneys sought to be disqualified have a unique and probably irreplaceable value to their client. Robert Beckman, one of the attorneys whose disqualification defendants seek (see note 2 *supra*), has served as Laker's counsel on all aviation matters in this country and most aviation matters worldwide for over ten years. Moreover, the subject matter of this lawsuit is quite specialized, and without Farmer and Beckman plaintiff would be dealt a significant, perhaps irreparable, setback. See also, note 80 *infra*.[8]

■ Second. Related to the interest in allowing plaintiff to proceed through its own counsel is the public interest in a speedy resolution of this lawsuit. See *Black v. Missouri, supra,* 492 F.Supp. at 873–74. The complaint alleges an international conspiracy among a number of foreign and domestic airlines in violation of the United States antitrust laws, and that conspiracy is claimed to have resulted ultimately in plaintiff's financial collapse. The case may have important consequences both for the many American consumers of the services of transatlantic carriers and for Laker's creditors. Despite the public interest in the expeditious resolution of this lawsuit, the action has already been charac-

---

3. Opposition papers have been filed by Robert E. Jordan III and others of the law firm of Steptoe & Johnson, specially retained by plaintiff's counsel for this proceeding.

4. The decision whether to disqualify counsel grows out of the Court's responsibility to supervise the members of its bar, and it is viewed to be discretionary. *Groper v. Taff,* 717 F.2d 1415 (D.C.Cir.1983); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *City of Cleveland v. Cleveland Electric Illuminating Co.,* 440 F.Supp. 193, 195–96 (N.D.Ohio 1977).

5. *J.P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1360 (2d Cir.1975) (Gurfein, J., concurring); see also *Woods v. Covington County Bank,* 537 F.2d 804, 812 (5th Cir.1976); *International Electronics v. Flanzer,* 527 F.2d 1288, 1293 (2d Cir.1975).

6. See, *e.g., Woods v. Covington County Bank, supra* 537 F.2d at 810; *Williamsburg Wax Museum v. Historic Figures, Inc.,* 501 F.Supp. 326, 332 n. 19 (D.D.C.1980), *aff'd in part and vacated in part on other grounds sub nom. National Souvenir Center, Inc. v. Historic Figures, Inc.,* 728 F.2d 503 (D.C.Cir.1984); *Black v. Missouri,* 492 F.Supp. 848, 874 (W.D.Mo.1980); *City of Cleveland v. Cleveland Electric Illuminating Co., supra,* 440 F.Supp. at 195–96.

7. *Woods v. Covington County Bank, supra,* 537 F.2d at 810; *W.T. Grant Co. v. Haines,* 531 F.2d 671, 677 (2d Cir.1976).

8. Cf. *Williamsburg Wax Museum v. Historic Figures, Inc., supra,* 501 F.Supp. at 332 n. 19; *Black v. Missouri, supra,* 492 F.Supp. at 873–74.

terized by extraordinary delay due to defendants' litigation tactics. See, *e.g.*, notes 78 and 79. Were the motion to disqualify to be granted, the resulting additional delay might well be crippling. In fact, defendants have requested that all work product prepared by counsel to date be withheld from substitute counsel, and that steps be taken to insulate disqualified counsel from any new counsel.

■ Third. The Court may appropriately consider an attorney's right freely to practice his profession. *Woods v. Covington County Bank, supra,* 537 F.2d at 812. The judicial system benefits from attorneys who have a specialized expertise, for such attorneys bring to the process both experience and a special insight into those problems which are encountered within the areas of their expertise. Yet questions concerning conflict of interest are likely to arise more frequently when an attorney has a specialized practice, especially in an area as narrow as that in which Farmer has practiced, since the same parties and similar issues of law will frequently be encountered in subsequent lawsuits. A court must be careful not to penalize attorneys who chose such specialties, and it therefore should not order disqualification without carefully examining whether a genuine conflict exists.

■ Fourth. When the motion is based upon an attorney's government service—as this motion is in primary part—a court must also be wary not to take action which will discourage other attorneys from entering government employ. As Judge Kaufman admonished in his seminal article, *The Former Government Attorney and the Canon of Professional Ethics,* 70 Harv.L. Rev. 657, 668 (1957):

> If the Government service will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in the practice of a technical specialty which he had devoted

years in acquiring, and if that sterilization will spread to the firm with which he becomes associated, the sacrifice of entering government service will be too great for most men to make.

See also, Cutler, *New Rule Goes Too Far,* 63 A.B.A.J. 725 (1977).

■ Fifth. Disqualification motions "have become increasingly popular 'tools of the litigation process, being used ... for purely strategic purposes.' " *Rice v. Baron,* 456 F.Supp. 1361, 1368 (S.D.N.Y.1978), quoting *Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977). Accord *Williamsburg Wax Museum v. Historic Figures, Inc., supra,* 501 F.Supp. at 331. See also Part VI *infra.* Accordingly, courts have in recent years become more and more skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny.[9]

In its determination of the specific issues discussed below, the Court has considered these various policies in juxtaposition to the need to disqualify counsel who has a true conflict of interest.

## II

■ Defendants' primary challenge is based on Farmer's prior government service, and in this regard they rely on Canon 9 of the D.C.Code of Professional Responsibility[10] which states that "[a] lawyer should avoid even the appearance of professional impropriety," and upon the Code's Disciplinary Rule 9–101(B) (hereinafter generally referred to as the Disciplinary Rule) which implements Canon 9 and provides that:

> A lawyer shall not at any time accept private employment in connection with any matter in which he or she participated personally and substantially as a public officer or employee, which includes acting on the merits of a matter in a judicial capacity.

---

**9.** See, *e.g., Koller v. Richardson-Merrell, Inc.,* 737 F.2d 1038 (D.C.Cir.1984); *Board of Education v. Nyquist,* 590 F.2d 1241 (2d Cir.1979).

**10.** The Canon was adopted by this Court in Local Rule 4–3(IV)(b).

In support of their disqualification claim, defendants provide a laundry list of governmental proceedings in which Farmer was claimed to have been involved and which are said to be connected with this litigation. However, under the Rule, as a former attorney with the government, Farmer would have engaged in improper conduct only by accepting private employment (1) in the same "matter" (2) in which he "participated personally and substantially" while in government service.[11]

The question therefore is not, as defendants would have it throughout their briefs, whether there is some relationship or connection between this litigation and a subject under Farmer's jurisdiction while he was serving the government.[12] Rather, the pertinent questions are, first, whether Farmer's government activity was the same "matter" as the alleged conspiracy to destroy Laker, and second, whether he participated "personally and substantially" in that matter while serving as a public employee.

The case law illustrates this point. Most cases concerning the Rule involved *ongoing litigation* where a former government attorney who participated in the litigation in that capacity later represented one of the parties in a private capacity,[13] and the remaining cases were often *parallel case proceedings*, where a private civil action was instituted charging allegations which were virtually identical to a criminal or agency proceeding brought by the government against the same defendant.[14] As will be seen *infra*, the instant case is entirely different.[15]

Moreover, it is not enough to rummage through Farmer's past career to find incidents which may be said to have some relationship to the present suit. Among the principal evils the Rule was designed to prevent are the practice of "switching sides" (leaving government employ and representing another party in the same matter) and the use by government attorneys of their public position to develop suits which they may later bring in a private capacity.[16] As has aptly been noted, the fear is of "the great potential for lucrative returns in following into private practice the course already charted with government resources." *General Motors Corp. v. City of New York,* 501 F.2d 639, 650 (2d Cir.1974). The Rule also aims at such abuses of a government position as the concentration on potentially profitable cases with a view towards subsequent private gain. See *Allied Realty v. Exchange National Bank,* 283 F.Supp. 464, 469 (D.Minn.1968).

Unless the past government matter is essentially like the private litigation conducted in the present, these concerns are largely absent. Thus, disqualification is not mandated merely because it might be observed in retrospect that certain past

---

11. The Rule was recently amended in *Revolving Door,* 445 A.2d 615, 617 (D.C.App.1982) with respect to other subjects.

12. Defendants' Reply Memorandum at 5.

13. See, *e.g., Kessenich v. Commodity Futures Trading Comm'n,* 684 F.2d 88 (D.C.Cir.1982); *United States v. Miller,* 624 F.2d 1198 (3d Cir. 1980); *Hull v. Celanese Corp., supra.*

14. See, *e.g., General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir.1974); *Telos, Inc. v. Hawaiian Tel. Co.,* 397 F.Supp. 1314 (D.Hawaii 1975); *Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank,* 283 F.Supp. 464 (D.Minn.1968), *aff'd,* 408 F.2d 1099 (8th Cir.1969).

15. The regulations of the Office of Government Ethics (5 C.F.R. § 737.9(g) provide a pertinent example of conduct not leading to disqualification:

> *Example 4:* A Senior Justice Department lawyer participated in an antitrust case against Q Company, which is represented by Y law firm. Immediately after leaving the Department, she goes to work with Y law firm, and assists at a trial representing Q Company in a different antitrust case, not involving the allegations in the Government case. Such assistance would not be barred because it does not occur in connection with the same particular matter.

16. *Kessenich v. Commodity Futures Trading Comm'n, supra,* 684 F.2d at 97; *Woods v. Covington County Bank, supra,* 537 F.2d at 814; *Telos, Inc. v. Hawaiian Tel. Co., supra,* 397 F.Supp. at 1316–17; see also 5 C.F.R. 737.5(b)(1) (comparable federal regulation).

governmental matters may have some factual connection to the allegations of a present complaint. Yet, as seen below, a simple connection, at best, is all that defendants are able to establish.

### III

Defendants first rely on several facets of Farmer's career in the Antitrust Division of the Department of Justice from October 1, 1969 to September 30, 1977.

#### A. *1974 Grand Jury Investigation*

First. During his tenure in the Public Counsel Section of the Antitrust Division, Farmer in 1973 conducted an investigation into alleged price-fixing among the North Atlantic carriers. Defendants claim that there is a similarity between the basic claim made by Farmer in a memorandum to support the grand jury investigation and one of the allegations made by Laker in its complaint in this case. However, there is no such similarity. In fact, the two matters are entirely separate and distinct.

The Laker complaint concerns an alleged conspiracy among several transatlantic airlines to eliminate its Skytrain service. Laker alleges that this service posed a threat to defendants' maintenance of high prices by airline agreement through the International Air Transport Association (IATA).[17] According to Laker, this conspiracy first took the form of a series of predatory schemes to offer more attractive, high-cost services at prices below the costs of these services. When these schemes were not completely successful, the airline defendants allegedly pressured Laker's lenders (also named as defendants) to deny Laker necessary financing, and to mislead Laker

into believing the financing would be provided in order to prevent it from seeking other sources of finance.

The focus of the 1973 grand jury investigation, on the other hand, was a single meeting reported in the press as having taken place in Geneva, Switzerland after an IATA traffic conference. The conference, and the meeting which followed, took place in December 1972, *four years before Laker's Skytrain service even came into existence.* In his memorandum seeking authority to conduct the grand jury probe, Farmer expressed his belief that the IATA members fixed North Atlantic fares outside the CAB-approved IATA rate machinery at the Geneva meeting after the IATA conference had failed to reach agreement on such fares. The memorandum does refer to the fact that "efforts to prevent further erosion of market share to charter services are clearly an important consideration behind scheduled North Atlantic air fare proposals," [18] but it indicates no concern whatever that the prices proposed at this informal Geneva meeting were predatory or designed to eliminate competition. The investigation involved simply the possibility of an agreement among the airlines to fix prices outside the approved machinery of IATA traffic conferences.

This is not only Farmer's own view of the matter. In addition to his testimony, there are before the Court an affidavit by Elliott Seiden (the attorney who replaced Farmer in December 1974 as lead counsel for the Justice Department in the grand jury proceeding) and a letter from Seiden to Farmer, both of which explicitly state that the 1973–74 grand jury proceedings are entirely unrelated to the Laker complaint.[19]

---

**17.** Since 1946, the fares for scheduled air transportation on North Atlantic airline routes have been set primarily by government-approved agreements among members of IATA.

**18.** Defendants quote this language out of context in an effort to link the grand jury investigation to Laker's complaint. But that reference is incidental to the complaint's focus upon the alleged scheme to destroy Laker's Skytrain service. The complaint *does not* allege a predatory

scheme to destroy charters before Skytrain came into existence.

**19.** Seiden's testimony is particularly credible since he is still employed at the Department of Justice and has no interest in this lawsuit. Defendants' suggestion that Seiden's affidavit is not based upon personal knowledge is simply incorrect. Seiden has testified that

[b]ased upon my familiarity with [the grand jury] proceedings, and from having read the

The defendants, by contrast, offer nothing but speculation based upon the generally expansive and unpredictable nature of grand juries, and upon similar discovery requests made in the grand jury investigation and in the instant lawsuit. One purpose of discovery, however, is to find new avenues of discovering further information, and requests are frequently drawn in broad and general terms and encompass much material which may turn out to be entirely irrelevant. A court would not be justified in finding that matters are related, much less essentially the same, so as to disqualify counsel, on the basis of demand for discovery.[20]

Second. Defendants also claim that Farmer should be disqualified because he had access to confidential information, some of it provided during the grand jury proceedings.[21] According to the defendants, Pan American and TWA provided a large number of documents containing trade secret information, IATA materials, and attorney-client communications in response to grand jury subpoenas, and they cite several decisions which indicate that it was one of the concerns underlying the Disciplinary Rule that unfair advantage could accrue to a private client whose attorney had access to confidential information while in government service.[22] There is no authority for the proposition, however, that an attorney should be disqualified under the Rule upon the basis of the receipt of confidential information when the matter in which he participated was not substantially related to the present litigation.[23] To the contrary, disqualification on these grounds was denied in a number of cases when the matters were not identical or substantially related.[24]

Defendants have made no attempt to establish that the documents submitted in 1974 are in any way material to this lawsuit,[25] or even that Farmer had actual knowledge of the contents of those documents or was familiar enough with them to be able to use them to the prejudice of defendants in a lawsuit ten years later.[26]

Like the case law, policy considerations do not support the disqualification of a government attorney merely because during his government service he had access to information about a corporation which subsequently turned out to become an opponent in a private lawsuit. If the law were otherwise, the limiting language of the Disciplinary Rule could be bypassed altogether by the simple claim that an attorney may have viewed confidential information while employed by the government, and government lawyers would face per-

complaint in *Laker v. Pan American, et al.,* it is my opinion that the subject of the grand jury investigation is entirely unrelated to the subject matters described in the *Laker* complaint.
Seiden affidavit at ¶ 5.

20. Discovery need not be limited to documents or testimony which would be relevant as evidence, but they may include papers and testimony which may be expected to lead to such evidence. Fed.R.Civ.P. 26(b)(1).

21. Defendants make this claim also with regard to a number of other events and proceedings.

22. See, *e.g., Woods v. Covington County Bank, supra,* 537 F.2d at 816; *Allied Realty v. Exchange National Bank, supra,* 283 F.Supp. at 467.

23. The cases in which the concern about access to confidential information is discussed and dis-

qualification was granted generally involve former prosecutors representing a private client in a civil matter relating to or arising out of the criminal prosecution in which he had substantial responsibility. See *Allied Realty v. Exchange National Bank, supra; Hilo Metals Co. v. Learner Co.,* 258 F.Supp. 23 (D.Hawaii 1966).

24. See *Flego v. Philips, Appel & Walden, Inc.,* 514 F.Supp. 1178 (D.N.J.1981); *International Union, UAW v. National Caucus of Labor Committees,* 466 F.Supp. 564 (S.D.N.Y.), *aff'd,* 607 F.2d 996 (2d Cir.1979).

25. Defendants repeat over and over that confidential information was supplied to the grand jury (Reply Memorandum at 13 note 9); they do not focus on the relationship of that material to this lawsuit.

26. Cf. *Control Data Corp. v. International Business Corp.,* 318 F.Supp. 145 (D.Minn.1970).

petual disqualification in their subsequent practices.[27]

### B. *Laker Skytrain Service Permits*

In December of 1974, Farmer became a Special Assistant to the Assistant Attorney General, Antitrust Division. In this capacity, he was involved in the preparation of the Department of Justice recommendation to the President in connection with his review of the Civil Aeronautics Board decision on Laker's Skytrain application in 1975,[28] and defendants advocate his disqualification for that reason. That claim is likewise without merit.

The Court finds that the Laker Skytrain permit proceedings are not the same "matter" as the instant lawsuit.[29] To be sure, the CAB grant of permission to Laker to operate the Skytrain service is a necessary factual predicate for this lawsuit since without that permission the service would not have existed. Beyond that, however, the CAB matter has absolutely nothing to do with this lawsuit: it was not a proceeding with either the same allegations[30] or the same legal issues as this lawsuit.[31] Thus, there was no switching of

side and there can be no concern that Farmer could have, somehow, participated in the approval of Laker's application with a view towards bringing this antitrust suit in a private capacity.[32]

### C. *The 1977 IATA Fare Proceedings*

Prior to Farmer's departure from the Department of Justice in October 1977, several carriers filed tariffs with the CAB proposing reduced fares on the London-New York route. These fares, commonly referred to as the 1977 IATA fare package, were later incorporated into an agreement among the members of IATA. The CAB heard oral argument from the interested parties on the proposal on September 7, 1977, and it issued a proposed order on September 16, essentially approving some of the fares and disapproving others. Pursuant to section 801 of the Federal Aviation Act, 49 U.S.C. § 1461, the Board then submitted its suspension and investigation order to the President for his review.[33]

Defendants claim that Farmer "appears to have been involved" in the proceedings relating to the 1977 IATA fare package.

---

**27.** Disqualification would be appropriate if the moving party were able to demonstrate with some degree of persuasiveness; that the material was indeed confidential and could not have been obtained by other means; that it is material to and has significance in the private litigation; and that under the circumstances the former government attorney would be able to use such information to the prejudice the moving party.

**28.** The President never acted on the CAB decision. Three years later, the CAB approved Laker's Skytrain application.

**29.** Moreover, Farmer has testified that he has no recollection that he was at all involved in the review of the 1977 CAB decision. This is not overcome by defendants' claim that he must have been involved because he normally participated in such reviews.

**30.** Defendants attempt to link the two matters by observing that the Laker complaint alleges that "[t]he airline defendants resisted Laker's efforts" to obtain government authority to operate its Skytrain service. Complaint ¶ 17. However, there is no indication that when the CAB approved Laker's application it was concerned with or investigated such resistence, or that if it

did, Farmer had any awareness of it. And defendants do not suggest otherwise.

**31.** Indeed, the decision to grant a permit does not involve "allegations" or "legal issues" so much as policy considerations. There is considerable doubt therefore whether a policy decision such as this may even be considered a "matter" within the terms of the Disciplinary Rule. See Part IV *infra.*

**32.** Defendants complain that Farmer has insight into the reasons generally for CAB and Presidential action or inaction that is unavailable to them. This is too insubstantial a concern. If a court were to disqualify counsel whenever he may have gained special insight into governmental deliberations, disqualification of former government attorneys, or indeed former law clerks of judges, would become mandatory and routine.

**33.** In a letter written September 26, 1977 to Chairman Kahn, the President rejected the CAB's proposed order as inconsistent with the Administration's foreign economic policy. He stated that he would consider suspension of these fares in the future should the CAB obtain evidence that they were predatory.

More specifically, they suggest it was his "normal practice" to participate in the Antitrust Division's recommendations in connection with the subsequent Presidential review of the CAB's decision,[34] and they attempt to establish his presence at two meetings held on September 14 and 23, 1977, respectively—the first between representatives of British Airways and Antitrust Division officials, the second between representatives of various agencies and officials at the White House.

However, there simply is no credible evidence that Farmer participated in any of these proceedings. In support of their assertions, defendants provide only the affidavit of William C. Clarke, one of the British Airways representatives at the September 14 meeting, who states that it is his recollection that he first met Farmer at that meeting. The affidavit also candidly concedes, however, that "none of the other participants with whom I have spoken say that they can recall whether Mr. Farmer was present"; that his own recollection of the meeting is "somewhat hazy after five years"; that he has no recollection of anything said or done by Farmer at the meeting; and that it is "possible that I could be mistaken about Mr. Farmer's participation." Clarke affidavit at ¶ 20. Defendants also offer speculation revolving around the fact that there is a notation on Farmer's calendar on September 23, 1977, of the meeting at 11:00 a.m.

Defendants' "evidence" does not come close to establishing Farmer's involvement

in the Presidential review of the CAB order,[35] particularly since much more credible evidence suggests the precise opposite. Farmer has stated that he has no recollection of attending either meeting or otherwise participating in the IATA fare package proceedings on behalf of the Department of Justice during September 1977. That denial is supported by objective facts.

Farmer was planning his move to the CAB's Bureau of International Aviation (BIA) at the time, and his primary activities were assisting CAB Chairman Kahn in preparing his testimony for hearings related to the Bermuda 2 agreement and working on airline deregulation legislation for the Department of Justice.[36] As concerns more specifically the September 14 meeting, none of the participants who were contacted (with the equivocal exception of Clarke) recall attendance by Farmer, and, most significantly, a Department of Justice public file memorandum does not identify Farmer as being in attendance.[37] With regard to the September 23 meeting, it apparently took place at the White House. Security clearance records for the White House and the Old Executive Office Building reveal that Farmer was not admitted to either of those buildings on that day.

The Court concludes that Farmer did not participate in the 1977 IATA fare package proceedings.[38]

## IV

■ Defendants next discuss the various regulatory and policy-making activities

---

**34.** Farmer did not participate in the presentation of the Antitrust Division's position before the CAB. He was away from Washington on vacation from July 29 to August 28, during which time the Department of Justice's pleadings were filed with the CAB. Abbott B. Linsky, Jr., represented the Department at the September 7 oral argument.

**35.** Even if the proof were stronger, it is doubtful that Farmer's participation in the 1977 IATA fare package proceedings and decisions could be characterized as substantial enough to meet the requirements of the Disciplinary Rule. "Participation" is defined to include "the rendering of advice," D.C.Code of Professional Responsibility, Definitions (1983) but that does not mean that whenever an individual has been

involved in the rendering of advice his participation violates the Disciplinary Rule. The advice, like any participation, must have been sufficiently substantial to raise the types of concerns underlying the Rule.

**36.** Farmer affidavit at ¶ 15; Clarke affidavit exh. 15 ("Jordan memo") at 7–8.

**37.** Jordan memorandum at 9, App.D; Clarke affidavit at ¶ 20; Farmer affidavit at ¶¶ 16–19.

**38.** Accordingly, it need not be decided whether these proceedings constitute the same matter as this lawsuit, or whether for the purposes of the Disciplinary Rule, they may at all be considered as a "matter."

**34**

of the CAB during Farmer's tenure there, and they assume that, as Director of BIA, Farmer must have been directly involved. However, even if that premise is correct,[39] disqualification does not follow. It is well established that rule-making and policy-making activities do not constitute a "matter" within the meaning of the Disciplinary Rule for the purposes of disqualifying counsel from a subsequent private lawsuit,[40] and they do not become so unless the activity is narrow in scope and is confined to specified issues and identifiable parties such that it may be properly characterized as "quasi-judicial" in nature.

■■■ The District of Columbia has specifically defined "matter" to include:

> any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest, or *other particular matter involving a specific party or parties.*

*Revolving Door, supra,* 445 A.2d at 618 (emphasis added).[41]

The language indicates that the Disciplinary Rule is limited to government actions focusing upon particular, distinct, and identifiable sets of facts with reasonably measurable implications and consequences involving specific parties. As one commentator has noted,

> the word 'particular' was inserted in the definition of 'matter' in order to emphasize that the restriction applies to a spe-

cific case or matter and not to a general area of activity.[42]

Contrasted with such distinct situations are rulemaking activities and other actions of broad application, such as supervision of a program of compliance or the formulation of general policies, standards, or objectives. The regulations implementing the Ethics in Government Act (5 C.F.R. § 737.5(c)) make this point very clearly:

> [A particular matter involving a specific party or parties] typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties. Rulemaking, legislation, the formulation of general policy, standards, or objectives, or other action of general application is not such a matter.

■■■ In short, a government attorney may participate in legislative or other policy-making activity without precluding his subsequent representation of private parties affected by such rules or policies.[43]

Defendants' objections regarding the consequences of Farmer's activities at the CAB are therefore in the main entirely beside the point. They complain about Farmer's involvement in the implementation of a new deregulatory policy of fostering international fare competition on the North Atlantic routes; his advocacy of views with respect to policies which may become issues in this lawsuit; his involvement with issues that, it is claimed, he

---

**39.** The issue of Farmer's personal and substantial participation in the activities cited by defendants is discussed *infra.*

**40.** To be sure, the Disciplinary Rule would bar counsel from representing a private party in a regulatory or rule-making proceeding when he previously participated as a government attorney *in the same proceeding.* Such a practice of "switching sides" is the primary target of the Rule. See note 13 *supra.* Contrary to defendants' assertion, allegations that defendants engaged in predatory pricing do not constitute an attack on the rate-making proceedings held at the CAB during Farmer's tenure there such that he may be said to have "switched sides." Laker is not litigating CAB approval of defendants' fares or its policies concerning deregulation.

**41.** This language is identical to the definition of matter in the comparable provision of the Ethics in Government Act, 18 U.S.C. § 207.

**42.** B. Manning, *Federal Conflict of Interest Law* 55 (1964), quoting H.R.Rep. No. 748, 87th Cong., 1st Sess. 20 (1961) (regarding the identical definition in federal ethics statute).

**43.** See 5 C.F.R. § 737.5(c):

> [A] former Government employee may represent another person in connection with a particular matter involving a specific party even if rules or policies which he or she had a role in establishing are involved in the proceeding.

should have recognized would have effects upon particular parties; and his participation in the establishment of the framework within which the defendants were granted authority to engage in price competition on the routes at issue in this lawsuit.

These are not the sorts of specific problems the Disciplinary Rule was designed to prevent. If advocating views, fostering a policy, or establishing a framework for competition were sufficient to disqualify counsel, every government attorney holding a position of authority in an executive department or an administrative agency would be disqualified from the practice of law in his field for a very long time. Farmer in particular would be precluded from participating in any litigation involving airline regulation, rates, or antitrust questions.[44] That is not, that cannot be, the law. The Disciplinary Rule accordingly does not include such activities unless, as indicated above, they have become narrowed to specific issues and parties.

The Court will now examine the specific CAB activities in controversy in light of these principles.[45]

A. *Scheduled Fare Proceedings*

In late 1977, the CAB issued a number of orders suspending foreign airline tariffs until such time as the European destination countries entered into *ad hoc* agreements which would permit suspension in the event the fares proved to be preda-

tory with respect to charter services. As various countries entered into such agreements with the United States the CAB thereafter vacated its suspension orders.[46]

In the spring of 1978, several airlines filed individual tariffs with the CAB for the 1978 peak summer season.[47] Various charter tour operators filed objections to these fares, arguing that the airlines were seeking to extend low winter season fares into the peak season, that the fares would be destructive of their North Atlantic charter business, and that at the very least they should not be extended into countries that had not entered into agreements with the United States.[48] In response to these complaints, the CAB's Bureau of Pricing and Domestic Aviation (BPDA) prepared and sent to the Board a memorandum recommending that the complaints be summarily dismissed and the summer fares be permitted to become effective. Farmer signed the memorandum as "coordinated" with the BIA following its preparation.[49]

Further tariff revisions were filed late summer 1978 proposing fare revisions for the winter 1978/79 season.[50] With the exception of a complaint filed against TWA's tariff by a consumer group, no complaints were filed against these tariffs. The BDPA prepared two memoranda recommending suspension of the proposed increases with respect to one of the normal fares but approving the others. Farmer signed the first memorandum as coordinated with BIA, indicating next to his signa-

---

44. These principles also illustrate the irrelevance of Farmer's CAB activities to this lawsuit. The establishment of a framework which granted defendants the freedom to engage in price competition is not the same matter as the alleged abuse of that freedom in the form of an antitrust conspiracy to establish anti-competitive pricing in order to eliminate a particular competitor.

45. Defendants' suggestion that the CAB activities should not be examined separately but as one single "matter"—the regulation of low fares being charged by scheduled carriers—is clearly inappropriate in light of the principle that a matter be "particular." See note 42 *supra*. As indicated below, the defendants' broad brush effort obscures rather than illuminates the issues on this motion.

46. The CAB reversed its policy on the necessity of entering into these *ad hoc* agreements in an order issued May 2, 1978.

47. These tariffs generally proposed upward seasonal adjustments from the new low fares from the 1977/78 winter season.

48. Laker was not among those complaining.

49. The CAB ultimately adopted the BDPA's recommended order. *Transatlantic passenger fares,* Nos. 31232, *etc.,* C.A.B. Order 78–5–3 (May 2, 1978).

50. The proposals again generally involved fare increases.

ture that he did so before reviewing the matter to meet the CAB's internal deadline. The second memorandum was signed for Farmer by his deputy.[51]

During this period, the CAB also concluded a rulemaking proceeding entitled *North Atlantic Fares Investigation* to establish long-term ratemaking guidelines for evaluating fare levels and structures. That proceeding resulted in a Board determination that it was no longer desirable to establish regulatory standards by which to judge international rates in view of its new policy of relying on competition to regulate airline prices. *North Atlantic Fares Investigation*, No. 27918, C.A.B. Order 78–5–157 (May 25, 1978).

Defendants complain about Farmer's participation in these various activities, but the complaints are not well taken because all these proceedings clearly constituted rulemaking.[52] A review of the various memoranda and orders reveals that all the decisions rendered were based upon general policy considerations, and that none of the proceedings could in any sense be characterized as "adjudicative," or even, with one exception, "investigative."[53] These fare proceedings therefore cannot be used as a basis for disqualifying Farmer.

Finally, defendants claim that confidential information was provided to the CAB and thus to Farmer in connection with the *North Atlantic Fares Investigation*. However, Farmer had no access to that information, since the CAB issued an order insulating such data from all staff members except those in the Bureau of Fares and Rates.[54] Farmer was never a member of that Bureau.

### B. Data Collection, Deregulation, and International Negotiation

■ First. Soon after the President's letter of September 26, 1977 to Chairman Kahn, the CAB instituted a procedure for obtaining and compiling data from American and foreign air carriers relating to the low fares offered on transatlantic scheduled routes. This information was supplied to the CAB's Bureau of Accounts and Statistics of which Farmer was not a member. An August 11, 1978 memorandum prepared by that Bureau proposed the issuance of an order to continue the collection of data, and it noted that the data "permit more comprehensive analyses of market trends in transatlantic discount traffic" and were necessary "to keep abreast of the impact these low fares are having on charter traffic in North Atlantic Markets."

The routine submission of data pursuant to CAB direction to assist the agency to monitor traffic and to assess the impact of its regulatory decisions is clearly not sufficiently specific to be a "matter" within the terms of the Disciplinary Rule.

As for defendants' claim that because of their proprietary nature, these statistics were submitted to the CAB in confidence, as noted above there is no authority for the proposition that counsel may be disqualified simply because he had access to confidential matters while employed by the government. See note 27 *supra*. In any event, defendants do not claim that Farmer actually examined this data, and Farmer has stated that he has no recollection of seeing it.[55]

Second. During this same period, the CAB also instituted a series of proceedings

---

**51.** The CAB again adopted the BDPA's proposed orders. *Transatlantic fare increases,* No. 33276, C.A.B. Order 78–9–38 (August 23, 1978); *Transatlantic fare increases,* No. 33622, C.A.B. Order 78–10–61 (October 5, 1978).

**52.** Moreover, as noted, Farmer was so little involved that he signed one BPDA memorandum before reviewing the matter, and another was signed for him by his deputy.

**53.** The *North Atlantic Fares Investigation* is the obvious exception. That proceeding, however,

was clearly a broad rulemaking proceeding and not a "matter" under the Disciplinary Rule.

**54.** *North Atlantic Fares Investigation,* No. 27918, C.A.B. Order 77–10–100 (October 25, 1977).

**55.** There is also a question as to whether the data is still confidential. Beckman was apparently able to acquire this same information through a Freedom of Information Act request. Thus, if it was related to the issues of this lawsuit, it would be discoverable in any event.

designed to liberalize CAB rules governing charter carriers, so as to permit them to compete with the reduced fares offered by scheduled carriers. Again, as rulemaking proceedings concerned primarily with policy considerations, they were not "matters" under the Disciplinary Rule for the purpose of disqualifying counsel. Furthermore, the proceedings governing charter carriers do not appear even to be related to the instant action, which alleges an antitrust conspiracy to eliminate Laker's scheduled Skytrain services.

Third. Defendants cite a number of international discussions and negotiations in which Farmer was a participant while Director of the BIA. For example, he was a delegate to negotiations between the United States and Great Britain with respect to four annexes to a previously-negotiated agreement known as "Bermuda 2," which established a general framework for the operation of air services between the two countries. Farmer also participated in bilateral negotiations between the United States and the Federal Republic of Germany, which also resulted in an agreement providing a framework for determining fares and rates as well as charter rules, and he was a delegate to tripartite discussions between the United States, Canada, and the European Civil Aviation Conference.[56]

Such broad, policy-oriented activities as international discussions and negotiations clearly do not amount to "matters" under the Disciplinary Rule. To the extent that these negotiations resulted in agreements, they were plainly legislative in nature, similar to treaties or executive agreements. Although during the course of negotiations items of a more specific nature may have been discussed,[57] such discussions were entirely collateral to the main purpose of the negotiations.[58]

## V

Defendants also move for Farmer's disqualification on the basis of his activities in private practice.

Following his employment at the CAB, Farmer joined the law firm of Galland, Kharasch, Calkins & Short. He was a member of that firm from April 1979 until August 1981, when he left to join Robert Beckman to form the firm of Beckman & Farmer. In August of 1980, Swissair asked the Galland firm to render antitrust advice with respect to Swissair's activities in certain IATA committees, and in connection with this employment Farmer was given access to confidential correspondence between IATA and another defendant concerning the scope of the antitrust immunity for IATA activities.[59] The Galland firm was also retained by a committee of IATA in October 1980 to render advice similar to that provided to Swissair, on essentially the same issues. On November 21, 1980, Farmer and other members of the Galland firm met with that committee to provide advice on the questions raised. Following the meeting, IATA requested that the Galland firm provide a memorandum reducing the oral advice to writing.

---

**56.** The report of the chairman of the United States delegation to that conference reveals that the meetings took the form of a discussion session and an exchange of views rather than negotiations.

**57.** The incidental reference to an agreement by the United States that its "aeronautical authorities shall promptly consider [an application for renewal of Laker's permit] in accordance with Article 3 of the 1977 Air Services Agreement," does not change the thrust of the negotiations or the Court's conclusion. That subject was incidental to the proceedings and not significant to the instant lawsuit.

**58.** Defendants once again claim that Farmer had access to confidential information, basing that assertion upon vague statements in two affidavits to the effect that "TWA proprietary information" was given to U.S. officials during the Bermuda II and U.S.-West Germany negotiations. Affidavit of Thomas K. Taylor at ¶ 4; affidavit of Kenneth L. Briggs at ¶ 6. Mere exposure to proprietary information is a far cry from the concerns and language of the Disciplinary Rule and the case law, particularly where the evidence is entirely indeterminate.

**59.** The representation culminated in a telex from the Galland firm to Swissair dated September 1980.

Defendants seek to disqualify Farmer on the basis of the attorney-client relationship he and his previous law firm had with Swissair and IATA, pursuant to Canon 4 of the D.C.Code of Professional Responsibility and on DR 4–101(B) (hereinafter referred to as the Confidentiality Rule) which deals with a lawyer's duty to preserve the confidences and secrets of a client.

▮▮▮ To enforce the duty of confidentiality in successive representations, this Circuit, like others, has adopted the "substantial relationship" test first enunciated in *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y.1953), as the standard for disqualification. *Williamsburg Wax Museum v. Historic Figures, Inc.*, 728 F.2d 503, 517 (D.C.Cir.1984). Under this test, the former client has the burden of showing that the pending suit is substantially related to the matters in which the attorney previously represented him. *Williamsburg Wax Museum v. Historic Figures, Inc., supra,* 501 F.Supp. at 328; *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc., supra,* 113 F.Supp. at 268.[60] See also, *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.1981); *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980).

The theory underlying the substantial relationship test is as follows. A court could not properly inquire into the nature and extent of the confidences actually provided to the moving party's former attorney, because such an inquiry would reveal the very confidences sought to be protected.[61] For that reason, the Court will instead assume that, if a substantial relationship was established, confidences were disclosed that would have a bearing on the present representation. *T.C. Theatre Corp. v.*

*Warner Brothers, Inc., supra,* 113 F.Supp. at 268. In addition, when the subject matters of the two representations are substantially related, it is assumed that a genuine threat exists that the confidences revealed to former counsel will be used for the benefit of the present adversary despite the attorney's good faith efforts to avoid such use.[62] These standards are, of course, substantially more favorable to the defendants than would be a requirement of actual proof of the exchange of confidences.

▮▮▮ It is a question of fact whether there is a substantial relationship between present litigation and a previous matter or cause of action. *Williamsburg Wax Museum v. Historic Figures, Inc., supra,* 501 F.Supp. at 328. The focus of the inquiry is on the precise nature of the relationship between the present and former representations. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 646 F.2d at 1029. In light of the serious nature and consequences of such relationships, the Court has a duty to examine them with precision and care, and this Court has done just that.

▮▮▮ To that end, the Court examined the record submitted *in camera* with regard to this matter in light of this standard, and it has considered the several affidavits submitted by both parties, the confidential correspondence involved in the Swissair representation, the instructions presented to the Galland firm in the IATA representation, and the written materials in both representations which comprise the advice furnished to Swissair and IATA.

It should be observed initially that the previous matters consisted not of litigation but of advice within a particular factual

---

**60.** This Court has stated that it will grant disqualification "only upon a showing that the relationship between issues in the prior and present cases is 'patently clear' ... [and] when the issues involved have been 'identical' or 'essentially the same.'" *Williamsburg Wax Museum v. Historic Figures, Inc., supra,* 501 F.Supp. at 329, quoting *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739–40 (2d Cir.1978); accord *City of Cleveland v. Cleveland Electric Illuminating Co., supra,* 440 F.Supp. at 208–09.

**61.** *Emle Industries, Inc. v. Patentex,* 478 F.2d 562, 571 (2d Cir.1973); *T.C. Theatre Corp. v. Warner Brothers, Inc., supra,* 113 F.Supp. at 269.

**62.** See *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.1981); *Emle Industries, Inc. v. Patentex, supra,* 478 F.2d at 570–71.

context and with regard to specific concerns.[63] Thus, the prior representations may be considered substantially related to the present litigation only if the facts occasioning the need for advice have a substantial bearing on this suit. These facts have no such bearing.

The event which caused first Swissair, then IATA, to seek legal advice, was the proposal of the CAB to remove antitrust immunity for IATA Traffic Conference agreements and the reactions of some of the airlines to that proposal.[64] That proposal and the reactions thereto are of no significance whatever to the allegations of Laker's complaint or to the issues which it raises. These events are not even alluded to in the factual portion of Laker's complaint, and there is no reason why they should have been. Nor may the events be said to be implicitly contained by, or have any impact upon,[65] the allegations of the complaint: the CAB regulatory proposal simply has no relevance to the alleged illegal conspiracy to destroy Laker.[66]

The nature of the Swissair and IATA concerns which prompted them to request advice of the Galland firm further illustrates the essential dissimilarity between the previous consultations and the present litigation. Swissair and IATA sought merely general clarification of the antitrust immunity available to IATA carriers with respect to the normal functioning of various IATA committees. Plaintiff's affidavits, the nature of the advice requested, and the advice itself all reveal that the advice was being sought to assist the clients in understanding the requirements of the antitrust laws as applied to IATA committee activities in order to fully comply with them.[67] The advice sought and given did not relate to any particular factual activities or transactions involving IATA or any of its members. In fact, the written request for advice specifically excluded all antitrust implications of the IATA Traffic Conference ratemaking activities.

The advice requested and rendered thus bears no relationship to this case, involving as it does specific allegations of conscious and deliberate illegal activity. There is not the slightest suggestion that at the time they requested advice from the Galland firm any members of IATA were even contemplating any sort of illegal activity, or that they sought legal advice which might extricate them if they acted unlawfully. The clients' concern was simply how best to conduct business in order to comply with the law. Their general request for what amounted to straightforward, textbook advice cannot be considered to be substantially related to this lawsuit.[68]

Defendants' papers are brimming with claims of apparent similarities between this

**63.** This case is therefore unlike cases such as *Chugach Electric Association v. United States District Court,* 370 F.2d 441 (9th Cir.1966), where the attorney appearing for counsel for plaintiff in an antitrust action had been general counsel for defendant.

**64.** Because of the confidential nature of the materials submitted to the Court, it must necessarily speak in generalities.

**65.** This is particularly true in light of the fact that the CAB never implemented its proposal.

**66.** This analysis is not changed merely because it is through IATA Traffic Conferences that the IATA may agree upon rates, subject to CAB approval. It may of course be possible to imagine circumstances in which the events in question could have some factual connection to this case, but that would be true of any event of the past ten years involving the CAB, IATA, or any

of the defendants. Disqualifications are not based upon such speculation. In any event, scrutiny of the documents involved in the prior representations makes clear that there are no factual connections to this lawsuit.

**67.** Defendants can do no better in this respect than to claim that Farmer rendered advice "concerning the scope of ... the antitrust immunity of [various carriers] provided pursuant to the Federal Aviation Act." Reply Memorandum at 6.

**68.** Furthermore, it is important not to lose sight of the fact that one of the purposes of the "substantial relationship" standard is to protect the former client against the use to his detriment of confidential information provided to his former attorney. The correspondence and written instructions requesting advice do not contain, and the advice rendered does not reflect, any confidences with any bearing upon this case.

lawsuit and the earlier requests for advice which they claim create a substantial relationship. This inventory of similarities, however, may be reduced essentially to two points of contact.

The first is that both representations share a common area of law. This, of course, does not make two matters related. The second is that both matters involve IATA, its organization, operation, and activities.[69] But these areas of resemblances are both general and superficial; specific similarities between this lawsuit and Farmer's advice are entirely absent.[70] Absent such similarities, there is no case for disqualification. Were it otherwise, Farmer, or any other attorney who at any time furnished IATA with legal counsel, could never again participate. in a matter involving IATA. · The proscriptions of the Confidentiality Rule are not that draconian.

■ Moreover, the concern of the Confidentiality Rule and the case law is the protection of what the client tells his attorney, not what the attorney tells the client (except, of course, to the extent the attorney's advice incorporates client confidences). The fact that this case may involve points of law contained in the Galland firm's recitation of antitrust law to Swissair and IATA is therefore irrelevant. As defendants themselves put it, the substantial relationship standard involves the relationship between the two representations, not the relationship between the two sets of legal advice,[71] i.e., the fact that similar

legal advice may have been given to different clients.

The Court therefore finds as a fact, based upon its review of the pertinent documents, that there is no substantial relationship between the Galland firm matters and this lawsuit.[72]

Defendants also argue that, even if these matters are not substantially related, Farmer should still be disqualified because he was privy to confidential information concerning IATA. Farmer has sworn that he was privy to no confidential information with respect to IATA activities and that he received no confidential information relevant to this proceeding.[73] His showing is not overcome by the kind of information adduced by defendants.

■ Defendants have made no effort to demonstrate that confidences were disclosed to Farmer which relate to this lawsuit; instead, they are content merely to state a conclusion to that effect. If defendants are correct in their approach, a party moving for disqualification may avoid the burden imposed upon it under the case law simply by asserting, without elaboration, that confidences had been imparted under the prior attorney-client relationship. Because it is improper for a Court to inquire into the confidences actually provided,[74] the clients would in effect hold veto power over their former attorneys' ability ever to represent an opponent in another matter.

---

**69.** IATA is not named as a defendant in this lawsuit, and the complaint does not allege that IATA itself played a role in the defendants' conspiracy.

**70.** Cf. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 646 F.2d at 1030–31; *Moyroud v. Itek Corp.,* 528 F.Supp. 707, 708 (S.D.Fla. 1981); *Jackson v. J.C. Penney Co.,* 521 F.Supp. 1032, 1035 (N.D.Ga.1981).

**71.** Defendants' Reply at 34 n. 35.

**72.** None of these conclusions is altered by defendants' frequent references to discovery requests for information concerning IATA meetings and activities. As indicated above, arguments based upon the scope of discovery are not necessarily persuasive grounds upon which to

establish that two matters are substantially related.

Moreover, defendants' discussions of discovery requests are broad and unspecific. On one occasion, the Court is referred to "some" 400 pages of deposition testimony, and it is apparently expected either to accept blindly defendants' characterization of that testimony or to read through one thousand pages of deposition testimony in search of the unidentified 400 pages. In any event, the Court finds that, even accepting defendants' characterizations of plaintiff's discovery, a substantial relationship has not been established.

**73.** Farmer *in camera* affidavit at ¶¶ 3, 4, 7, 10.

**74.** See note 61 *supra.*

That is not the law.[75]

In short, there is no reason to presume or to find on this record that Farmer engaged in unethical behavior,[76] or that his representation of plaintiff in this case would be inconsistent with his prior representation of Swissair and IATA.[77]

## VI

It is, finally, appropriate to consider this motion in the context in which it has been filed. As noted above, courts have become increasingly aware that some motions for disqualification are motivated not by a fine sense of ethics and a well-developed desire to remove from litigation practitioners whose ethics are less acute, but, bluntly, by a desire to achieve a tactical advantage. Some of the defendants in this suit have engaged in other maneuvers to avoid or delay a decision on the merits, ranging all the way from their litigation in Great Britain,[78] to their determined resistance to legitimate discovery.[79]

In connection with this motion, defendants have evidently scoured the government files for references to Farmer's name and for activities for which he may have ever had some responsibility. On the basis of these efforts, they then provided the Court with a roll of activities which allegedly bar him, and all associated counsel, from representing plaintiff in this case. This broad, wide-ranging and scattershot effort is undoubtedly designed to persuade the Court that where there is this much smoke there must be some fire. Yet, when the various claims are analyzed in detail, it becomes clear that there is no fire—there is only smoke.

Defendants frequently mischaracterize and misrepresent the nature and essence of Farmer's activities in both government and private practice; they often rely upon sheer supposition concerning the extent of Farmer's participation in government activities; and they ignore or distort the nature of this suit—all to achieve the goal of eliminating Laker's counsel from this action. See pp. 27–28 *supra.* In addition, there is every reason to believe that similar efforts would be directed against any new counsel Laker might retain, should it be able to find attorneys with the necessary experience and expertise who are not already retained by the twelve powerful and wealthy corporations which are defendants here.[80] This case, in brief, is a textbook

---

**75.** It is not the courts' duty to disqualify an attorney whenever a mere possibility exists that one of the canons of professional ethics could be violated. To the contrary; the Court presumes that, as an officer of the Court, each attorney may be depended upon to meet his professional and ethical obligations.

**76.** Cf. *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 609 (8th Cir.1977).

**77.** Defendants argue that the need for Farmer's disqualification under Canon 4 is reinforced by the concern underlying Canon 9, which seeks to protect against the appearance of impropriety. The case law is clear, however, that an attorney may not be disqualified under Canon 9 unless there is a reasonable possibility that some specifically identifiable impropriety actually occurred. *Woods v. Covington County Bank, supra,* 537 F.2d at 810; see also *Board of Education v. Nyquist, supra,* 590 F.2d at 1247. As the Court has found that there is no reason to believe that an impropriety has or will occur, it will not disqualify Farmer under Canon 9, whether considered in conjunction with Canon 4 or as an alternative grounds for disqualification.

**78.** See *Laker Airways Ltd. v. Pan American World Airways,* 559 F.Supp. 1124 (D.D.C.1983), *aff'd,* 731 F.2d. 909 (D.C.Cir.1984).

**79.** See, *e.g.,* a separate Opinion issued simultaneously herewith, which describes Lufthansa's performance with respect to discovery, 103 F.Supp. 42. Several of the other defendants likewise almost routinely resist discovery of whatever type and for whatever purpose, sometimes by enlisting the support of the foreign governments which own or control them, sometimes by almost childish objections (*e.g.,* the refusal to make corporation officials located in New York available for deposition in Washington on the ground that they cannot be spared at any time from their duties for the duration of the one-hour trip).

**80.** In their supplementary papers defendants reveal that they are actively investigating ("through Freedom of Information Act requests and other means") the prior government activities of a recent member of the firm of Beckman & Farmer who has begun working on this case. Defendants complain that they "have been unable to obtain sufficient information to present

example of the kind of misuse of the disqualification standards for tactical litigation advantage of which courts have become increasingly aware and wary.

None of this should be taken to mean that if Farmer's participation in this litigation did, indeed, violate the canons of professional ethics, the Court would allow him to remain. But for the reasons stated, that participation presents no such violations.

■ The Court is both justified and required to regard defendants' arguments through a practical lens, and to assess them in light of those practicalities. Its responsibility with respect to the supervision of its bar is not limited to the disqualification of attorneys for violations of the Code of Professional Responsibility; it also includes the rejection of efforts to abuse the Code through motions to disqualify which lack substantive merit and represent means to harass the opposing party.

The motion to disqualify counsel will be denied.

in appropriate detail their concerns about the potential ethical problems" they claim are

raised by that attorney's representation of Laker.