UNITED STATES FOOTBALL LEAGUE; Arizona Wranglers Football Club, Inc.; Birmingham Stallions, Ltd.; Chicago USFL Limited Partnership; Chicago Football Franchise Limited Partnership; Denver Gold Sports, Inc.; Houston USFL Football Franchise; Jax Professionals, Inc.; Memphis Showboats, Ltd.; the Michigan Panthers Football Club, Inc.; Football Generals, Inc.; New Orleans Breakers Limited Partnership; Bay Area Football Partners, Ltd.; Oklahoma Outlaws, Ltd.; Philadelphia Franchise USFL Associates; South Texas Sports, Inc.; Football Partners, Ltd.; and Orlando Football Partners, Inc., Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; the Five Smiths, Inc.; Indianapolis Colts, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Inc.; Rocky Mountain Empire Sports, Inc.; the Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston Oilers Inc.; Los Angeles Rams Football Company; Minnesota Vikings Football Club, Inc.; New England Patriots Football Club, Inc.; New Orleans Saints Louisiana Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Los Angeles Raiders, Ltd.; the Philadelphia Eagles Football Club; Pittsburgh Steelers Sports, Inc.; St. Louis Football Cardinals Co.; Chargers Football Company; San Francisco Forty-Niners, Ltd.; Tampa Bay Area NFL Football, Inc.; Pro-Football, Inc.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Seattle Professional Football and Alvin R. Rozelle, Defendants.

No. 84 Civ. 7484 (PKL).

United States District Court, S.D. New York.

April 4, 1985.

Spengler Carlson Gubar Brodsky & Frischling, Saxe, Bacon & Bolan, P.C., New York City, for plaintiffs; Robert S. Carlson, William J. McSherry, Jr., Richard P. Swanson, Donald G. Davis, Roy M. Cohn, Louis Biancone, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Max Gitter, Gerard E. Harper, New York City, of counsel.

## OPINION AND ORDER *

LEISURE, District Judge.

Plaintiffs in this action[1] have moved to disqualify counsel for the defendants,[2] Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"). The sheer number[3] and volume of the submissions on this motion are indicative of the complexity and importance of the issues the motion raises. A disqualification motion calls into question the ethics of attorneys, who are after all officers of the Court; reflects the movant's concern with safeguarding the confidentiality of information imparted to its former counsel; and raises the possibility that a litigant will be denied representation by counsel of its choice. Thus, such a motion implicates interests of the Court and the

---

* **NOTICE:** This opinion and order has been edited for the public record, to comply with the order in this case dated January 14, 1985, which declared the proceedings on this motion confidential. The unedited opinion has been filed under seal.

1. Plaintiffs in this action are the United States Football League ("USFL"), its member clubs and the former owner of a member club. The USFL is a not-for-profit unincorporated association which, with and for its member clubs, stages and promotes professional football games. Since its first season in 1983 it has been operating on a spring and summer schedule, though it has announced plans to switch to a fall and winter season beginning in 1986.

2. Defendants herein are the National Football League ("NFL"), its member clubs and NFL Commissioner Alvin R. ("Pete") Rozelle. Like the USFL, the NFL is a not-for-profit unincorporated association that presents professional football games. The NFL playing season is in the fall and winter.

3. I have received moving papers, opposition papers, a reply, a surreply and a rejoinder, as well as numerous supplementary letters. While I appreciate the parties' conscientious desire fully to inform and educate the Court, I would recommend that such procedure be avoided in the future.

Bar as well as the litigants, and to decide it, a sensitive balance is required.[4]

The Second Circuit has mandated that district courts deciding disqualification motions consider the factual record in detail.[5] Although I have followed the Second Circuit's instructions, this opinion may not reflect all the details of my consideration of this question. The parties have agreed that all papers relating to this motion are confidential and to be filed under seal, and I have issued an order to that effect. My review of the parties' submissions has been *in camera.* So as not to do violence to my order and the wishes of the parties, this opinion will discuss the facts in terms as general as necessary to maintain whatever confidences this motion seeks to protect.

## I. GENERAL BACKGROUND.

The complaint in this action seeks monetary and injunctive relief under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982). In Count One, the plaintiffs (hereinafter collectively referred to as "USFL") allege a number of acts and practices engaged in by defendants ("NFL") calculated to cripple competition in the business of organized major league professional football, in violation of § 2. These alleged monopolistic practices, according to the complaint, have inhibited the USFL from competing with the NFL for access to television network contracts, players, adequate stadium facilities, referees, investors and public interest and patronage. Count Two alleges a § 1 violation arising from a conspiracy among the NFL, its member clubs and Commissioner Rozelle with the involuntary cooperation of the three major television networks. The methods and objectives of the conspiracy described in Count Two are substantially similar to the monopolistic acts and practices alleged in Count One.

This motion arises from Paul, Weiss's representation of the prenatal USFL in

1981. The representation fell into three broad categories of activity: (1) nonlegal services, consisting of efforts to locate potential USFL franchise owners; (2) the services of one particular attorney, especially his antitrust advice relating to exclusivity clauses in stadium leases; and (3) corporate and tax work. The USFL contends that in the course of that representation Paul, Weiss was at least in a position to receive, and did actually receive, information from USFL organizers that would give an unfair advantage to Paul, Weiss in its representation of the NFL in this action. The USFL has urged that I apply the "substantial relationship" test formulated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.1953) to disqualify Paul, Weiss from representing the NFL in this action.

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject of the representation.

*Accord Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973). The USFL contends that this presumption is irrebuttable.

Paul, Weiss, for its part, argues that the representations are not "substantially related" under that test as it has been refined in the years since *T.C. Theatre.* Further, Paul, Weiss asserts that the presumption, if it applies here at all, is rebuttable, and has been amply rebutted by the papers Paul, Weiss has submitted to show that no relevant confidences were imparted to Paul, Weiss in the course of the former representation. Finally, Paul, Weiss points

---

**4.** *See, e.g., Waterbury Garment Corp. v. Strata Prods., Inc.,* 554 F.Supp. 63, 65 (S.D.N.Y.1982); *Neiman v. Local 144, Hotel, Hosp., Nursing Home & Allied Servs. Union,* 512 F.Supp. 187, 189 (S.D.N.Y.1981).

**5.** *See NCK Org., Ltd. v. Bregman,* 542 F.2d 128, 131 (2d Cir.1976).

to a "Chinese Wall" or "screen" erected within the firm to insulate those attorneys who worked on the USFL matter from those who are now representing the NFL, and argues that the screen should allay any unfounded fears the USFL may have that confidential information pertinent to this suit may be transmitted improperly within the Paul, Weiss firm.

The Second Circuit has directed that courts faced with disqualification motions take a "restrained approach that focuses primarily on preserving the integrity of the trial process." *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). Mere appearance of impropriety will not alone serve as a sufficient basis for granting a disqualification motion. Rather, the motion will be granted only if the facts present a real risk that the trial will be tainted.[6] *See Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). Only two readily identifiable situations raise the specter that the litigation will be tainted if one side's counsel is permitted to remain in the case: when the challenged attorney is concurrently representing adverse interests so that his vigor in pursuing the interests of one of them is questionable, *see, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir.1977); or when the attorney's successive representation of

adverse interests raises the possibility that in the present matter he will improperly use confidences gained in the prior representation to the detriment of his former client, *see, e.g., Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir.1980), *vacated on other grounds and remanded*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981). The USFL's motion in this case falls into the second category, that of safeguarding client confidences in a successive representation situation.

Where a disqualification motion is bottomed on the need to preserve client confidences,

an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983).[7] The Second Circuit

---

**6.** The Second Circuit's recent tightening of the standards for granting motions to disqualify counsel has been noted by commentators. *See, e.g.* Lindgren, *Toward a New Standard of Attorney Disqualification*, 1982 American B. Found. Research J. 419 (1982); Note, *Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 Harv.L.Rev. 1244, 1315–33 (1981).

**7.** *Allegaert v. Perot*, 565 F.2d 246 (2d Cir.1977), suggests that the test for disqualification includes a fourth element. In *Allegaert*, the Second Circuit held that for a disqualification motion to succeed, the movant must demonstrate that the subject attorney was in a position to receive confidences that the movant would expect would not be disclosed to the attorney's present client. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F.Supp. 326 (D.D.C.1980), *aff'd*, 728 F.2d 503 (D.C.Cir.1984); *C.A.M., s.p.a. v. E.B. Marks Music, Inc.*, 558 F.Supp. 57 (S.D.N.Y.1983); *Waterbury Garment*

*Corp. v. Strata Prods., Inc.*, 554 F.Supp. 63 (S.D.N.Y.1982); *Premium Prods. Sales Corp. v. Chipwich, Inc.*, 539 F.Supp. 427, 434 (S.D.N.Y.1982). This element becomes an issue especially in cases where a partnership, joint venture or other cooperative effort breaks up, or where two former co-parties to a litigation later sue each other. If counsel for the combined effort then represents one of the former co-venturers in the ensuing litigation, his adversary might move to disqualify him because of his receipt of confidences from the movant during the course of the cooperative venture. In *Allegaert*, the Second Circuit held that such motions must fail. The Court required that a movant show that it reasonably expected that any information it imparted to counsel would not be revealed to its former co-venturer in the course of the prior representation.

The *Allegaert* rule merits brief mention here because Paul, Weiss was in 1981 concurrently representing both the USFL and NFL Commis-

places "a high standard of proof on ... one who seeks to disqualify his former counsel ...." *Government of India v. Cook,* 569 F.2d 737, 739 (2d Cir.1978).[8]

In this case, both sides agree that the "substantial relationship" test governs this motion, and both agree as to what are the elements of the test. They further agree that the first element of the test—that the movant be a former client of its adversary's attorney—is met in this case. They part company when it comes to the other two elements, substantial relationship and receipt of confidences. Defining these terms and characterizing the facts of this case in light of them is the hard core point here. It is to those facts that I now turn.

## II. FACTS.

The USFL's relationship with Paul, Weiss began in February, 1981, when Robert H. Montgomery, Jr., a partner in Paul, Weiss, received a phone call from Shea Dixon ("Shea Dixon"), son of David Dixon ("Dixon"), a New Orleans attorney who had originated the concept of the USFL. In the first conversations, Shea Dixon described his father's idea of a summer football league, and mentioned that the league was still in a formative stage (Montgomery aff. ¶ 2).[9] His main interest at the time was in finding persons interested in becoming USFL franchise owners (*id.* ¶ 3), and he believed Paul, Weiss could help in that endeavor. Montgomery states that Dixon had decided to come to him because of his position as chairman of the Entertainment and Sports Law committee of the New York City Bar Association (*id.*).

Among Paul, Weiss's clients at the time was NFL Commissioner Rozelle.[10] Troubled by the possibility of an ethical problem if Paul, Weiss were to take on another football league as a client, Montgomery approached Arthur Liman, the Paul, Weiss partner who handles Rozelle's affairs, to discuss the matter. Montgomery outlined the proposal for the new league in general terms and noted that most of the early work for the USFL would probably be handled by the firm's corporate and entertainment departments. Liman and Montgomery concluded that Paul, Weiss could take

sioner Rozelle, who is a defendant in this action. Paul, Weiss, particularly Arthur Liman, had a longstanding relationship with Rozelle, having represented him in both football-related and non-football-related matters. When the USFL's organizers originally approached Paul, Weiss regarding possible representation, Paul, Weiss determined that it should not take on the USFL as a client unless both the USFL and Rozelle were informed of the concurrent representation and both approved. Both were so told, and neither one objected to the arrangement.

Neither side contends that the USFL's consent in 1981 implies that the USFL should feel as assured today as it must have in 1981 that its confidences will not travel within the Paul, Weiss firm and ultimately make their way to other Paul, Weiss clients, particularly Rozelle and the NFL. Nor is it argued that the former simultaneous representation triggers the *Allegaert* rule, namely, that the USFL could not have reasonably expected its confidences not to be revealed to Rozelle during the course of the prior concurrent representation. *Allegaert* presupposes that the subject matter of the prior representation was one in which both of the present litigants were involved together. In such a situation, it is not reasonable for a client to expect pertinent information to be withheld from its co-party. That is not the case here.

Since the matters Paul, Weiss handled for the USFL and Rozelle respectively in 1981 were not related to one another, the USFL could reasonably expect that its confidences would not travel to other clients of Paul, Weiss. Therefore, the *Allegaert* rule, even if it is a separate element of the test for disqualification, has no bearing here.

8. *See also Forte v. Cities Serv. Co.,* No. 82 Civ. 7120, slip op. at n. 1 (S.D.N.Y. Sep. 22, 1983) (Sand, J.) (available on LEXIS, Genfed library, Dist file) ("[Movant] Cities Service must be able to explain in detail what facts and issues were involved in the prior action and how those facts and issues relate to this case—specifically to the cross claims that Cities Service and Gulf have asserted against each other.").

9. Montgomery's affidavit of January 11, 1985 will be cited as "Montgomery afft.", and his affidavit of February 27, 1985 will be referred to as "Montgomery supp. afft.". Similar citation forms will be used for the affidavits of John C. Taylor, III, Max Gitter, and David T. Washburn.

10. Paul, Weiss's relationship with Rozelle is longstanding and continues to this day. Paul, Weiss also represents NFL Films, and on occasion has done legal work for the NFL (Liman afft. ¶ 4).

on the USFL as a client, but only if both the USFL and Rozelle were informed of the concurrent representation and each consented (*id.* ¶ 4, Liman afft. ¶¶ 3, 4). Each client did so consent (Montgomery afft. ¶ 5, Liman afft. ¶¶ 3, 4).

Early in March 1981, Montgomery arranged to meet with David Dixon. Before the meeting, he contacted another Paul, Weiss partner, John C. Taylor, III, and asked Taylor to join him at the meeting with Dixon. Montgomery thought Taylor might be able to aid in finding potential franchisees. The meeting took place on March 11, and lasted about two hours. At the meeting, Dixon told Montgomery and Taylor of his plans for the league. While it is unclear whether Dixon asked them at the meeting to have Paul, Weiss serve as counsel to the new league (*compare* Montgomery afft. ¶ 6 *with* Taylor afft. ¶ 3), Taylor and Montgomery did agree to help find persons interested in investing in the USFL (Montgomery afft. ¶ 6, Taylor afft. ¶ 3). Some days later, Montgomery and Taylor received from Dixon a letter dated March 12 that generally outlined the discussion at their meeting and named some of the possible owners they had discussed (Montgomery afft. ¶ 7 and Exhibit A).

In the weeks that followed, Montgomery and Taylor explored for prospective USFL franchisees. They made inquiries of a number of their partners regarding clients who might be contacted (Montgomery afft. ¶ 7, Taylor afft. ¶ 4). Certain Paul, Weiss clients were contacted through Paul, Weiss partners and some were put into direct contact with David Dixon. Others Montgomery and Taylor contacted directly. In one case, Taylor met with a client for about half an hour to discuss the proposed investment in the league.

The efforts of Montgomery and Taylor ultimately proved to be unsuccessful. None of the Paul, Weiss clients approached

decided to pursue the matter further, and none told anyone at Paul, Weiss of their reasons for declining to participate (Montgomery supp.afft. ¶¶ 5, 6; Taylor supp.afft. ¶¶ 4, 5; Abram afft. ¶¶ 4, 5).

On June 2, 1981, Dixon telephoned Taylor to inform him that a meeting of potential investors would be held the following Sunday, June 7. Dixon indicated he might want Paul, Weiss attorneys to be there, including someone familiar with antitrust law (Taylor afft. ¶ 5). Thereupon Taylor called Jay Topkis, a Paul, Weiss partner specializing in antitrust law, and asked him if he would be available to come to the meeting. Topkis said he was available (*id.*, Topkis afft. ¶ 3).

Montgomery phoned Shea Dixon the next day to find out if Paul, Weiss attorneys would be needed at the meeting. Shea promised to find out and to notify Montgomery (Montgomery afft. ¶ 8). The following day, June 4, David Dixon informed Montgomery by telephone that Paul, Weiss attorneys were invited to attend Sunday's meeting (*id.*). Montgomery then contacted Taylor and Topkis to advise them that they should attend (Topkis afft. ¶ 4 and Exhibit B; Taylor afft. ¶ 6).

Topkis set about preparing for the meeting. When and from whom he learned what antitrust question he would be addressing is unclear. What is clear is that on June 4 he asked a summer associate to research a specific question of interest to the USFL: the enforceability of exclusivity clauses in stadium leases.[11] By the next day, the summer associate had uncovered, *inter alia, Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), in which the District of Columbia Circuit held that the exclusivity clause in the Washington Redskins' lease with the Washington, D.C. Armory Board for RFK

**11.** An exclusivity clause purports to prevent the lessor from leasing the property to a person other than the lessee if that person will use the property to compete with the lessee. An example of a stadium lease exclusivity clause can be found in *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 985 n. 2 (D.C.Cir.1977) ("'at no time during the term of this Lease Agreement shall the Stadium be let or rented to any professional football team other than the Washington Redskins.'"), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

Stadium was vulnerable to attack under the essential facilities doctrine of the antitrust laws.[12] Topkis concluded that under the right circumstances such clauses could be unenforceable (Topkis afft. ¶ 5). This conclusion was not based on a consideration of any facts, however. As of that moment, Topkis had never seen any stadium leases (*id.* ¶ 7), so his opinion was entirely abstract.

On June 7, the USFL meeting was held at the Grand Hyatt Hotel in New York, attended by a number of committed investors, potential investors, members of the Dixon family, the Paul, Weiss attorneys, and certain other "consultants" and "interested observers" who "offered their assistance and expertise during or prior to" the meeting. The parties dispute the extent of Paul, Weiss's participation at the meeting. Plaintiff claims Paul, Weiss lawyers were present at least during crucial parts of the meeting (Spivak afft. ¶¶ 5–8). Topkis and Taylor, on the other hand, claim that all persons other than prospective owners were excluded from the meeting for most of the day (Topkis afft. ¶ 6, Taylor afft. ¶ 8). In any event, certain matters were discussed at the meeting which the parties do not dispute are pertinent to the instant action.

When the meeting broke for lunch, Taylor and Topkis spoke with a number of persons present. At some point during the day, Topkis expressed his opinion to some of the attendees that exclusivity clauses in stadium leases might be unenforceable under *Hecht* (Topkis afft. ¶ 7).

Paul, Weiss was named interim league counsel at the meeting, and was given a number of organizational matters to work on. At the conclusion of the day's business, the participants agreed to hold their next meeting a month later, on July 9 in Chicago.

The following day, Paul, Weiss began putting into place the team which would work on legally organizing the USFL. It was understood at the time that the organizational work was to be ready for the next USFL meeting on July 9 (Taylor afft. ¶ 9, Washburn afft. ¶ 4). Taylor recruited David T. Washburn to join him in representing the USFL (Taylor afft. ¶ 8). Thereafter, Washburn was the partner overseeing the actual work, though Taylor remained the partner-in-charge (Taylor afft. ¶ 8, Washburn afft. ¶ 2).

On June 10, Taylor, Topkis, Washburn and an associate met to discuss the representation of the USFL (Topkis afft. ¶ 11, Washburn afft. ¶ 3). Washburn reviewed the file and prepared a "new business memo," which described the work to be done as corporate (*id.* Exhibit A).

That same day, Topkis received a letter from Anthony DiLeo, an attorney who was present at the June 7 meeting (Topkis afft. Exhibit G).[13] The letter contained copies of the NFL's organizational documents and a copy of a memo dated January 28, 1981 that DiLeo had prepared for Dixon. The memo was a summary of cases dealing with the essential facilities doctrine (Davis afft. Exhibit A). Topkis reviewed the materials and sent a letter to DiLeo to express his appreciation (Topkis afft. ¶ 11, Exhibit H).[14]

In the meantime, Washburn was organizing the legal team to work on the USFL representation. Corporate matters were handled by Washburn and other attorneys in Paul, Weiss's New York office. Tax matters were referred to Jerome Kurtz of the firm's Washington, D.C. branch.[15] The

---

12. Like this action, *Hecht* was brought under sections 1 and 2 of the Sherman Act.

13. DiLeo's position and role are nowhere explained. He appears to have been advising David Dixon on certain USFL-connected matters.

14. Paul, Weiss's USFL file did not contain the memo on the essential facilities doctrine, but did contain the cover letter and Topkis's return letter.

15. Kurtz assigned a number of persons besides himself to work on the tax matters at the Washington office. All of Kurtz's information was obtained from Taylor and Washburn; he had no client contact. His only arguable client contact was not related to the League's tax problems (Kurtz afft. ¶ 5).

goal was to prepare drafts of a Subscription Agreement and a League constitution and bylaws in time for the July 9 meeting.

In mid-June, DiLeo sent to Topkis a letter dated June 15 (Davis afft. Exhibit B). In the letter, DiLeo referred to having had a conversation with Topkis "at lunch." This could be a reference to lunch at the June 7 meeting, but the record does not explain this for certain. Be that as it may, the letter makes reference to some matters Topkis and DiLeo had discussed, and enclosed a memorandum summarizing cases on the labor exemption to the antitrust laws.[16]

Through June and into July, Paul, Weiss's work consisted chiefly of considering the most advantageous legal entity for the USFL, considering tax aspects of the USFL's organization, and drafting various organizational documents for the new league, particularly a subscription agreement for the owners and a league constitution and bylaws.[17]

By July 1, Paul, Weiss associate Carl Reisner had prepared a memorandum for distribution at the July 9 USFL meeting (Davis afft. Exhibit C). The memo, which was sent to the Dixons via DiLeo, describe the terms of the Subscription Agreement drafted by Paul, Weiss. As described in the memo, the Subscription Agreement covered, among other things, plans for interim organization of the league, the type of legal entity into which the USFL should organize, initial financial commitments due from potential owners, and other matters of intraleague governance. Additionally, the memo covered certain plans for operation of the USFL, including player recruitment, division of revenues and the like.

On July 9, the USFL organizers met in Chicago. Taylor, Washburn and Reisner attended the meeting.[18] At the meeting, Judge Peter Spivak was named League Chairman. Although much of the meeting was devoted to discussing ways to compensate David Dixon for his origination efforts, other important organizational matters were discussed. The Paul, Weiss attorneys at the meeting promised to try to obtain copies of stadium leases (Taylor afft. ¶ 10, Washburn afft. ¶ 8).

From July 9 until the representation ended in mid-August, Paul, Weiss's work continued in a number of areas. Their efforts to obtain and examine stadium leases—which began before the meeting—were at least partially successful (Taylor afft. ¶ 13(c), Washburn afft. ¶ 9, Topkis afft. ¶ 12(d), see also Kurtz afft. ¶ 5). Considerable work was done on the Dixon compensation agreement (Washburn afft. ¶ 9), and some further efforts were made to find persons who might be interested in purchasing a USFL franchise (Taylor supp. afft. ¶ 7, Washburn supp. afft. ¶¶ 2, 3). Throughout this time, there were regular contacts between USFL representatives and Paul, Weiss attorneys (S. Dixon afft. ¶ 2, D. Dixon afft. ¶ 2, Spivak afft. ¶ 3, Washburn afft. ¶ 5).

In mid-August, Washburn received a letter from Spivak requesting that organizational work be "put on hold" for a while so that Spivak could contact the owners about certain proposed agreements (Washburn afft. Ex. C). As matters turned out, the USFL never asked Paul, Weiss to resume its work. Except for following up on matters already begun, Paul, Weiss did no further work for the USFL, and the USFL ultimately did not use any of Paul, Weiss's work product when it finally did formally organize. There was no contact between Paul, Weiss and the USFL on legal matters from September 1981 until December 1984, when Arthur Liman of Paul, Weiss contact-

---

**16.** Topkis's diaries contain no indication that he received or read the letter and memo from DiLeo. In any event, the subject matter of the memo is clearly unrelated to this case.

**17.** The work done for the USFL by Paul, Weiss is summarized in Washburn afft. ¶ 12 and the other affidavits referred to therein.

**18.** Paul, Weiss claims to have been excluded from the July 9 meeting as well, though only for a short time. (Taylor afft. ¶ 10, Washburn afft. ¶ 7).

ed the USFL's counsel to notify them that he had been retained as trial counsel for the NFL in this action.

## III. DISCUSSION.

Both parties agree that if it is found that a substantial relationship exists between Paul, Weiss's former representation of the USFL and the firm's present representation of the NFL, then a presumption arises that Paul, Weiss received during the prior representation confidences pertinent to this action. The scope and effect of the presumption, though, are disputed, *see infra* Part III.B.1. As a threshold matter, however, I must ascertain whether a substantial relationship exists between the two representations.

### A. *Substantial relationship.*

One of the subtle problems presented by this motion is ascertaining what a "substantial relationship" is under the law as it now stands.[19] In the Second Circuit, recent cases have defined the 'substantial relationship' test to require virtual congruence of issues. Thus, the Second Circuit has stated that as a practical matter, motions to disqualify should be granted only if "the rela-

tionship between issues in the prior and present cases is 'patently clear[,]' ... 'identical' or 'essentially the same.'" *Government of India, supra,* at 739–40 (citing *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 754–56 (2d Cir.1975) *overruled on other grounds, Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir.1980), *vacated,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *NCK Org., Ltd. v. Bregman,* 542 F.2d 128, 135–36 (2d Cir. 1976) (Mansfield, J., concurring); *Emle,* 478 F.2d at 572; *Motor Mart, Inc. v. Saab Motors, Inc.,* 359 F.Supp. 156, 158 (S.D.N.Y.1973)) (footnote omitted).[20]

For example, in *Emle, supra,* the challenged attorney, Rabin, had represented Burlington Industries, a plaintiff in a previous declaratory judgment action. Burlington was 50% owner of Patentex, which licensed patents to licensees, many of whom were co-plaintiffs in the earlier action. The defendant in that first suit, Kayser-Roth, counterclaimed, alleging that Burlington controlled Patentex and through it conspired with others to infringe Kayser-Roth's patents. The nature of the Burlington-Patentex relationship was a

19. *See* Harvard Note, *supra* note 6, at 1325 ("Case law provides an uncertain definition of the term ['substantial relationship'] to concerned attorneys."). Apparently, defining "substantial relationship" is a longstanding problem, dating back at least as far as 1955, two short years after *T.C. Theatre. See United States v. Standard Oil Co.,* 136 F.Supp. 345, 355 (S.D.N.Y. 1955), quoted in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 754 (2d Cir.1975) ("[u]nfortunately, the cases furnish no applicable guide as to what creates a 'substantial' relationship.") *overruled on other grounds, Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir. 1980), *vacated,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

20. The Second Circuit's approach, as noted, centers on comparing the issues dealt with in each representation and presuming disclosure of confidences once a substantial relationship is established. The Seventh Circuit takes a somewhat different view. Rather than focusing on issues, it focuses on evaluating the relevance to the instant litigation of the confidences allegedly communicated in the prior representation. It uses a three-step analysis.

Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be deter-

mined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir.1978). *Accord La Salle Nat. Bank v. County of Lake,* 703 F.2d 252, 255–56 (7th Cir.1983); *Novo Terapeutisk Laboratorium, A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 195–96 (7th Cir.1979) (en banc).

For purposes of the case before me, I see no practical difference between the Second Circuit's comparison-of-issues approach and the Seventh Circuit's approach of evaluating the relevance to the instant case of the alleged confidential communications. However, it may be that in certain situations the difference in approach could be significant. *But see Emm Ess Metals Co., Inc. v. Triumph Alloys Int'l, Inc.,* 1979–1 Trade Cas. (CCH) ¶ 62,680 (S.D.N.Y. May 11, 1979) (Southern District case adopting Seventh Circuit's *Westinghouse* approach).

matter of material dispute in that litigation, and Rabin was involved in much of the factual investigation pertinent to that question.

In the *Emle* litigation, Rabin represented Emle against Patentex and Burlington. Although the *Emle* suit arose from facts different from those which precipitated the Kayser-Roth litigation and presented different legal issues, Burlington was named as a defendant in *Emle* because of its alleged control of Patentex. In affirming the district court's disqualification of Rabin, the Second Circuit noted that "[e]ach proceeding involves a claim that Burlington controls Patentex and uses this control for an illegal purpose," and added that there was an "identity of issues between the two cases" as a result. *Id.* at 571. Thus, in *Emle* the disqualification was based on the presence in the later litigation of a material factual issue which was significant in the earlier representation.

In *Government of India, supra,* attorney Meeker had been associated with a firm that had represented Cook Industries in a prior litigation, and had done substantial work on that matter. Meeker's new firm represented India in the later suit against Cook. Except for the identity of the plaintiff, the two suits were virtually identical, raising the same allegations of improper weighing and presenting the same factual issues as to Cook's loading practices and operating procedures. Because of Meeker's knowledge of Cook's loading practices which he had acquired as a result of his work on Cook's behalf at his prior firm, his new firm was disqualified.[21]

The Court in *C.A.M., s.p.a. v. E.B. Marks Music, Inc.,* 558 F.Supp. 57 (S.D.N.Y.1983), on the other hand, denied a disqualification motion on grounds, *inter alia,* that there was no substantial relationship between the former and present representations.[22] The former representation pertained to a suit over ownership of a movie soundtrack.

Both C.A.M. and E.B. Marks were parties in that suit, C.A.M. as plaintiff and E.B. Marks as a fourth-party defendant. The later litigation was a declaratory judgment action brought by C.A.M. seeking to determine whether E.B. Marks had any contractual rights vis-a-vis C.A.M. to certain lyrics written for the soundtrack. Since "contracts between C.A.M. and E.B. Marks were not the subject of the [prior] lawsuit," *id.* at 59, the Court found a substantial relationship between the two representations lacking, even though there was a superficial resemblance between the cases in that both involved a dispute over rights in the soundtrack.

In *GAF Corp. v. Heyman,* 559 F.Supp. 748 (S.D.N.Y.1983), a proxy fight had given rise to litigation between GAF's management and insurgent Heyman. An associate ("Smith") in the firm representing Heyman ("Finley, Kumble") had, while at a different firm, participated in representing GAF in products liability litigation before coming to Finley, Kumble. GAF moved to disqualify Finley, Kumble on the basis of Smith's work at his former firm.

The *GAF v. Heyman* litigation involved allegations by Heyman of fraudulent misrepresentations by GAF's senior management. GAF claimed that Smith's involvement in the product liability suits had exposed him to GAF's future plans and prospects, management's decision making process and especially

> facts and circumstances bearing on issues of integrity, effectiveness, and business judgment of GAF management (and) facts and circumstances ... likely to be relevant to the salability, and to management information and attitudes with respect to salability, of the building materials business.

*Id.* at 751. GAF argued that such knowledge of management's plans bears on the

---

**21.** *See also Cheng v. GAF, supra; Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir.1975); *Yaretsky v. Blum,* 525 F.Supp. 24 (S.D.N.Y.1981).

**22.** The main ground for disqualification in C.A.M. was the rule of *Allegaert v. Perot, see supra* note 7. The challenged firm had represented both C.A.M. and E.B. Marks in the earlier litigation.

falsity of the representations at issue in the case.

Judge McMahon denied the motion, holding that the relationship asserted by GAF was too attenuated to be "substantial." The issues asserted by the products liability cases and those presented by the allegations of fraud were simply not related, much less identical.[23]

In each of these cases, the prior representation involved litigation. The standard applied in each case is readily discernible: if the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same, then there is a "substantial relationship" between the representations for purposes of a disqualification motion. Ascertaining the substantiality of a relationship between two representations is more difficult, however, when the former representation entailed not litigation but general background legal work. The nature of litigation is to define and narrow areas of dispute; thus it is relatively easy to identify the subject matters or issues to which the previous representation was directed. The rendering of legal advice in a non-litigation context, however, tends to be less focused and the issues less discrete. The attorney deals with a large number of small problems. This is particularly true in a situation where, as here, a business is starting up. In a business's organizational phase, many of the issues confronted are of the "what if" variety. Counsel's job is to anticipate and foreclose the possibility of future legal problems for the client. So the diffuse nature of the "issues" confronted in such a representation considerably complicates the task of identifying a "sub-

stantial relationship" between that representation and a later litigation.

■ The test basically is the same, though: whether facts which were necessary to the first representation are necessary to the present litigation. This test can be easily applied where the matters addressed in the first representation could be parsed into discrete issues. For example, in *Morton-Norwich Prods., Inc. v. International Salt Co.*, 195 U.S.P.Q. 641 (N.D.N.Y.1977), the court found that transactions with a third party, KNZ, were material to both the prior and present representations. Although the former dealt with a contract issue and the latter with validity of the underlying patent, the presence of a common factual question meant that the substantial relationship test was satisfied. So there is a substantial relationship between the two representations if facts pertinent to problems for which the original legal services were sought are relevant to the subsequent litigation.

More general legal representation can be relevant to a later litigation, but only if the later litigation fairly puts in issue the entire background of the movant. *Finkelstein v. Chock Full O'Nuts Corp.*, 82 Civ. 6725 (S.D.N.Y. Oct. 19, 1982), is one case in which general familiarity of the challenged firm with the movant's affairs was held not to be sufficient to establish a substantial relationship between the two representations. In *Finkelstein*, plaintiffs and defendants were engaged in a proxy contest. Plaintiffs filed suit, claiming that defendants had misstated and omitted to disclose certain facts in filings with the SEC and had conspired to entrench themselves as management of the corporation. Defend-

---

**23.** Judge McMahon analyzed the issues presented by the respective cases as follows.

There is no question that information pertaining to the management, profitability, potential exposure and value of a business impacts upon a decision of whether or not to sell the business. However, whether the building materials business is salable, or even whether senior management of GAF believed it to be salable, is not directly in issue in either of the cases before us. Rather, what is at issue is whether the senior management of GAF, as

part of a campaign to fend off a proxy fight, issued false statements claiming that serious negotiations regarding the potential sale of the business were underway and would continue during 1982. Also at issue is whether senior management utilized corporate resources in this campaign in breach of fiduciary duty. The issues in the prior product liability and present cases cannot be termed identical or essentially the same.

*GAF*, 559 F.Supp. at 753.

ants were represented in the action by a firm ("Kaye, Scholer") which until recently had represented plaintiffs and certain of plaintiffs' businesses on various corporate, tax and personal matters. Plaintiffs moved to disqualify Kaye, Scholer.

■ In denying the motion, Judge Cannella held there was no substantial relationship between the two representations: "Plaintiffs' claims are based solely on the acts or omissions of defendants and not on any allegedly false or misleading information transmitted by defendants to Chock Full's shareholders concerning plaintiffs' financial or managerial abilities." *Id.* at 4. Thus, knowledge of a former client's financial and business background is not in itself a basis for disqualification if the client's background is not in issue in the later litigation.

If, however, the litigation must deal with questions of the movant's market behavior, then the challenged attorney's knowledge of the business plans, economic organization, prospective market position and other such background information about the movant becomes relevant. This is particularly true in antitrust cases.[24] The more wide-ranging the allegations of the complaint, the more likely it is that background legal work will be relevant to the instant litigation. *Cf. Em Ess Metals Co., Inc. v. Triumph Metal Alloys Int'l, Inc.,* 1979-1 Trade Cas. (CCH) ¶ 61,947 (S.D.N.Y. May 11, 1979); *CITC Indus., Inc. v. Manow Int'l Corp.,* 1978-1 Trade Cas. (CCH) ¶ 62,680 (S.D.N.Y. Feb. 24, 1978), discussed *supra* note 24.

The complaint in this action alleges a far-reaching series of acts dating back to 1945 and continuing throughout the 1970's

(before there was any USFL) by which the NFL monopolized the market for major league professional football (Complaint ¶ 22). The allegations amount to a charge that the NFL made sure to occupy the market in such a way as to make effective competition impossible. In effect, the USFL is attacking the market structure the NFL allegedly put into place. This market structure affects sources of capital (owners), publicity and media exposure through television, personnel (players and referees), and playing facilities (stadiums).

■ When this case is viewed in this light, it becomes clear that the services Paul, Weiss rendered to the USFL are substantially related to this litigation.[25] Members of Paul, Weiss participated in the USFL's search for owners—a source of capital to which the NFL allegedly handicapped the USFL's access. The Subscription Agreement drafted by Paul, Weiss dealt with a number of matters of league structure and planning which could be relevant to the questions of causation and damages. That is, whether or not the USFL would have been viable had the NFL not monopolized the professional football industry could become an important issue in the litigation, one pertinent to both liability and damages. It is also relevant to the amount of damages the USFL may recover if its injuries are found to be attributable to NFL conduct rather than to any mismanagement by the USFL of its own business. Thus, the legal work touching on minimum initial investments, player recruitment methods, allocation of revenues and other such matters—some of the basic matters pertaining to the soundness of the USFL's structure—is substantially related to matters fairly raised in the complaint.[26]

**24.** *See CITC Indus., Inc. v. Manow Int'l Corp.,* 1978-1 Trade Cas. (CCH) ¶ 61,947 at 74,006 (S.D.N.Y. Feb. 24, 1978) (emphasis in original):

So long as the antitrust claim is based *only* on the fraudulent misuse of the Zumbro patent [with which attorney Relson has no connection whastoever], and not on other allegations of attempts to monopolize, the prior representation of CITC by Mr. Relson does not require his disqualification .... Without a broad assault on CITC's practices which

could relate substantially to issues involved in Relson's prior representation, there are insufficient grounds for requiring his disqualification.

**25.** What effect my finding of a substantial relationship should have is a different question. It is dealt with *infra,* Part III.B, C.

**26.** Paul, Weiss relies heavily on *Laker Airways, Ltd. v. Pan Am World Airways, et al.,* 103 F.R.D. 22 (D.D.C.1984) to establish that the two repre-

Therefore, on the facts in the record before me, I find there is a substantial relationship between the two representations.[27]

## B. *Receipt of confidences.*

■ The substantial relationship test does not exist for its own sake. Rather, it serves as a substitute for proof that is generally improper for a court to entertain. The test for disqualification requires a finding of a substantial relationship between the two representations because that finding is the basis for a presumption that the former client of the challenged firm imparted to the firm confidential information relevant to the present suit. The presumption arises in order to forestall a direct inquiry into whether confidential information was in fact transmitted by the client. Such an inquiry would be improper; it would put the movant to the choice of either revealing its confidences in order to· prevail on the motion or else refraining from moving to disqualify, thereby running the risk that its adversary will use its confidences against it in the litigation. *See, e.g., Cheng,* 631 F.2d at 1056; *NCK,* 542 F.2d at 134; *Emle,* 478 F.2d at 571; *Yaretsky v. Blum,* 525 F.Supp. 24, 28 (S.D.N.Y.1981); *T.C. Theatre,* 113 F.Supp. at 268, 269.

1. *Rebuttability.* The parties differ as to whether the presumption is rebuttable. Plaintiffs argue that because the purpose of the presumption is to prevent proof that would lead to revelation of confidences, the presumption necessarily must be irrebuttable.[28] They draw support for this argu-

---

sentations are not related. Its argument would be correct if Paul, Weiss's services in 1981 had been limited to Topkis' opinion on the enforceability of exclusivity clauses. Such an abstract opinion divorced from any concrete factual considerations would not be related to the complaint's allegations of monopolistic practices aimed at foreclosing competition in the market for professional football. But Paul, Weiss's services went considerably beyond Topkis's opinion. The fact that Topkis's work was the only *antitrust* work done for the USFL does not end the matter. It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes. *See e.g., Emle, supra* (one common factual question in two otherwise unrelated litigations can lead to disqualification), *Laker, supra,* at 38–40. So the fact that Paul, Weiss's antitrust services were not substantially related to the subject matter of this litigation does not mean that other aspects of the firm's representation of the USFL can not be substantially related.

27. A large part of the dispute in this motion is over defining what are the issues being litigated here. Defendants contend that the dispute is over the existence *vel non* of anticompetitive conduct by the NFL directed against the USFL once the USFL began its operation in competition with the NFL. Thus, they argue that since Paul, Weiss negotiated no stadium leases or television contracts for the USFL, was not involved in any transactions in which the NFL exerted pressure on others in order to discourage them from dealing with the USFL or otherwise was privy to any information about NFL conduct directed against the USFL, the representations are not substantially related. Plaintiffs, of course, take a broader view of the mat-

ters at issue in this litigation. They aver that certain of the matters addressed in Paul, Weiss's 1981 representation of the USFL are at least substantially similar if not identical to matters material to this litigation. They point to Paul, Weiss's services in attempting to find owners, in rendering advice on stadium access and in drafting the USFL's formational documents as matters which will be material to this litigation.

On balance, plaintiffs' conception of the scope of this litigation is more realistic. This litigation is not limited only to considerations of NFL conduct aimed at the USFL which occurred once the USFL began competing. Rather, the complaint alleges that the NFL not only occupied the entire market, but also took steps to ensure that it would be structurally impossible for any newcomer to compete effectively. The entire present structure of the market for professional football is in issue here. In the face of such allegations, Paul, Weiss's claims that its representation did not deal with any discrete instances of NFL misconduct are meaningless; it is not discrete instances that are at issue here.

28. The presumption that confidences were disclosed should be distinguished from the different presumption that each individual lawyer in the firm was privy to those confidences. The latter presumption is rebuttable. *See Schiessle v. Stephens,* 717 F.2d 417, 420 n. 2 (7th Cir. 1983); *Analytica, supra,* at 1267; *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir.1982); *Silver Chrysler, supra; Laskey Bros. of W.Va., Inc. v. Warner Bros. Pictures,* 224 F.2d 824 (2d Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956). The Eighth Circuit's view is somewhat different. *See Arkansas v. Dean Food Prods. Co., Inc.,* 605 F.2d 380, 385 (8th Cir.1979) ("Facts submitted to

ment from an impressive body of case law in other circuits. *See, e.g., Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266–67 (7th Cir.1983) (" 'it is not appropriate for the court to inquire into whether actual confidences were disclosed' ") (quoting *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 (7th Cir.1978)); *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1347 (5th Cir.1981) ("the presumption of disclosure is not susceptible of rebuttal by proof."); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir.1981) ("Once the former client proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation."), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981); *Trone v. Smith,* 621 F.2d 994, 1000 (9th Cir.1980) (even if parties were to stipulate that no confidences passed, challenged attorney would still be disqualified); *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 608 (8th Cir.), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1977), *overruled on other grounds, In re Multi-Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.1980). Paul, Weiss, for its part, argues that in the Second Circuit the presumption can be rebutted, with leave of court. It relies on Judge Mansfield's concurrence in *Government of India v. Cook Indus.,* 569 F.2d at 741, and the opinion in *Lemelson v. Synergistics Research Corp.,* 504 F.Supp. 1164, 1167 (S.D.N.Y.1981) ("the better view [is] that the court has latitude to permit the attorney to rebut ... this presumption."). There is, however, authority in this jurisdiction that holds the presumption irrebuttable.[29] *Yaretsky v. Blum,* 525 F.Supp. 24, 29 (S.D.N.Y.1981)

("The presumption that confidential information has been received is not rebuttable."); *Government of India v. Cook Indus., Inc.,* 422 F.Supp. 1057, 1060 (S.D.N. Y.1976), *aff'd.* 569 F.2d 737 (2d Cir.1978).

■ For purposes of this case, however, I need not determine whether the Second Circuit would ordinarily permit the district court to receive proof to rebut the presumption. At the request of plaintiffs (the movants herein), and with defendants' consent, I have issued a confidentiality order directing that all submissions to the Court for purposes of this motion be filed under seal. This has enabled the parties to reveal to me *in camera* the full scope of the attorney-client relationship between Paul, Weiss and the organizers of the USFL. Indeed, plaintiffs have submitted to me documents describing the substance of assertedly confidential communications. To hold the presumption irrebuttable in a case like this one simply makes no logical sense. The purpose of the assertedly irrebuttable presumption is to foreclose proof relating to confidences. *See, e.g., Cheng, supra,* at 1056. Once the parties agree to permit such proof, the purpose the irrebuttability rule is supposed to serve is gone; hence the rule itself—assuming there is such a rule—should be gone as well for purposes of this case.

Accordingly, on this motion the presumption that the USFL disclosed confidential information to Paul, Weiss attorneys during the prior representation is rebuttable. The next step is to see whether that inference has been rebutted. To do so, however, I must first consider what it is that Paul, Weiss must prove it did not receive. In other words, what is a "confidence" for purposes of a disqualification motion?

---

rebut the existence of actual conflict, in an effort to escape the impact of Canon 4 [protecting client confidences] would not in every case assure escape from the impact of Canon 9 [avoiding appearance of impropriety], where the non-existence of actual conflict is presumed."), *overruled on other grounds, In re Multi-Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.1980) (en banc), *vacated,*

449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).

**29.** Additionally, it is at least a fair inference from the language of *Cheng* that the Second Circuit views the presumption as generally irrebuttable. *See Cheng,* 631 F.2d at 1056.

2. *Confidences.* The case law speaks a good deal about the need to protect confidences, but nowhere explains exactly what is the type of information that disqualification is necessary to protect. Virtually any view can find some support in the case law. Paul, Weiss contends that the disqualification remedy is appropriate only when the endangered communications are protected by the evidentiary attorney-client privilege. Relying on Disciplinary Rule 4–101(A) of the Code of Professional Responsibility, which defines "confidence" in terms of the evidentiary privilege,[30] Paul, Weiss has offered a wealth of newspaper articles containing information that it contends the USFL has characterized as confidential (Gitter afft. Exhibits A, B, C, D, E; Gitter supp. afft. Exhibit A) in order to demonstrate that the information was in the public domain and thus not confidential. *See Lemelson, supra,* at 1168 (information included in public record of earlier litigation held not to be basis for disqualification). The USFL counters that even information available to the public is protected from use by the movant's former attorney under the law of disqualification, *see, e.g. NCK,* 542 F.2d at 133.[31]

There is a substantial amount of vintage Second Circuit law that grants the disqualification remedy in situations where the information to be protected is not necessarily within the scope of the evidentiary privilege.

In *NCK Org., Ltd. v. Bregman,* 542 F.2d 128 (2d Cir.1976), the Second Circuit granted the movant's disqualification motion in the face of protests that the subject attorney received no confidential information. The Court noted that this argument was mistaken on two counts. First, even if the services the lawyer performed for the movant were not legal in nature and therefore did not involve the seeking of legal advice which is protected by the privilege, the substantial relationship test still requires disqualification. *Id.* at 133 ("we cannot

---

**30.** " 'Confidence' refers to information protect by the attorney-client privilege under applicable law."

The First Circuit apparently feels that the disqualification motion is limited to protecting privileged information only. *See Kevlick v. Goldstein,* 724 F.2d 844 (1st Cir.1984).

**31.** Strictly speaking, this view accords with the ethical obligations of the attorney under the Code of Professional Responsibility ("CPR"). Under Disciplinary Rule ("DR") 4–101(B),

a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

"Confidences" are defined in DR 4–101(A), *see* note 28, *supra.* DR 4–101(A) defines "secrets" as well: " 'secret' refers to other information [not a confidence] gained in the professional relationship that the client has requested be held inviolate *or the disclosure of which would* be likely to be detrimental to the client."

The CPR proscribes knowing use of client confidences *and secrets.* The disqualification remedy is supposed to guard against even inadvertent revelation or use of client information, *see, e.g., Emle,* 478 F.2d at 571. Thus, the USFL's argument has some appeal.

The CPR is not, however, dispositive of this motion. While the CPR is a source by which the courts may be guided, it is not the final word on disqualification. Courts are not policemen of the legal profession; that is a matter for the disciplinary arm of the bar. Disqualification is granted to protect the integrity of the proceedings, not to monitor the ethics of attorneys' conduct. As the Second Circuit has noted,

The reporter for the ABA Committee that drafted the Code of Professional Responsibility recently noted that the Code's Disciplinary Rules were drafted for use in disciplinary proceedings and were not intended to be used as rules governing disqualification motions. The Code nevertheless will continue to provide guidance for the courts in determining whether a case would be tainted by the participation of an attorney or firm.

*Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26 (2d Cir.1980) (en banc) (citations omitted), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). *See also W.T. Grant Co. v. Haines,* 531 F.2d 671, 677 (2d Cir.1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it."). Thus, Paul, Weiss's potential violation of the provisions of the CPR is not in itself a reason to disqualify.

perceive a real distinction, in terms of the 'substantial relationship' test, between legal work and non-legal work"). Further, the Court stated that even facts that are a matter of public record or information obtained by the lawyer from sources other than his client can serve as the basis for disqualification if the substantial relationship test is met. *Id.*

■■■ A number of other cases support this proposition, *e.g., Emle, supra,* at 573; *Morton-Norwich, supra,* at 643. The continued vitality of that proposition is, however, open to question. Since the 1979 decision in *Board of Educ. v. Nyquist,* 590 F.2d 1241 (2d Cir.1979), the guiding principle in considering motions to disqualify counsel is safeguarding the integrity of the court proceedings; the purpose of granting such motions is to eliminate the threat that the litigation will be tainted. *Accord Armstrong v. McAlpin,* 625 F.2d 433, 444–45 (2d Cir.1980), *vacated,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). With threat of taint the lodestar of the law of disqualification, it is apparent that the breadth of the earlier definitions of confidences should be constricted somewhat. Only information that would give the attorney an unfair advantage that will taint the trial should be a sufficient basis to disqualify that attorney. Obviously, privileged communications would fall into this category. But other material would be comprehended as well. Precisely which facts will taint the trial is a question that is best considered in the context of the particular facts presented by each case. Although it is impossible to foresee every factual scenario, generally it may be said that where use of such client information would give the challenged attorney an unfair advantage in a substantially related subsequent representation adverse to his former client, disqualification may be an appropriate remedy. A thorough examination by the Court of the nature of the instant case and the scope of the prior representation (such as the one engaged in here) is, of course, a necessary step in determining the impact on the instant litigation of client information obtained by the challenged attorney in the course of the prior representation. *Cf. NCK, supra,* at 131 (court considering disqualification motion should consider factual record in detail).

3. *The record in this case.* Having found a substantial relationship between Paul, Weiss's former representation of the USFL and its present representation of the NFL, I must presume that confidences relevant to the substantially related matters were disclosed to Paul, Weiss by the USFL in the course of the 1981 representation. In the circumstances of this case, *see supra* Part III.B.1., I must consider whether Paul, Weiss has rebutted the inference of receipt of confidences. Since in this case direct evidence of transmission of confidential information has been offered, I must address as well the tainting effect, if any, of that information.

Paul, Weiss has offered a wealth of information describing the course of their 1981 representation of the USFL. Much of it has been aimed at demonstrating that the antitrust advice rendered by Topkis at the June 7 meeting was not based on any facts imparted to him by USFL representatives. The evidence offered is comprehensive and convincing; the USFL does not contradict any of the proof directed to this point. However, as was discussed *supra,* other aspects of Paul, Weiss's representation are substantially related to the issues raised by the instant litigation. As to those aspects of the representation, it is presumed that Paul, Weiss received confidential information from USFL representatives. Thus, I must decide whether the proof offered by Paul, Weiss is sufficient to overcome the presumption raised by my finding of a substantial relationship.

a. Finders' services. As I noted above, since the complaint alleges efforts by the NFL to dissuade potential owners from investing in or doing business with the USFL (Complaint ¶ 46), Paul, Weiss's attempts to locate prospective USFL franchise owners are unquestionably related to this action. Indeed, Paul, Weiss's involvement in this area is so relevant that I

suspected that Paul, Weiss attorneys might become potential witnesses in the case and subject to disqualification for that reason. I requested that the parties submit to me supplemental papers addressed to this issue.

The papers submitted to me have convinced me that Paul, Weiss attorneys would have no evidence to offer. None of them was informed of the reasons the solicited clients decided not to invest in the USFL. In fact, the Paul, Weiss attorneys received virtually no information about the USFL proposal from the clients they approached, except for negative responses. Thus, in their soliciting activities they were not exposed to any information relevant to the allegations of the complaint.

 b. Stadium leases. Paul, Weiss correctly points out that the antitrust advice about the enforceability of stadium lease exclusivity clauses rendered by Topkis at the June 7 meeting was not substantially related to the issues raised by this litigation because it was an opinion given in the abstract, not in a specific factual context. *See supra* note 24. That was not, however, the sum total of Paul, Weiss's services with respect to stadium leases. During the summer of 1981, Paul, Weiss's attorneys collected and studied stadium leases from a number of cities (*See* Topkis afft. ¶ 12(d) & Ex. L) What those studies revealed is not described in the record. It is entirely possible that patterns of restrictive terms in the leases emerged that may well be traceable to NFL policy. The record does not reflect what, if anything, the study revealed. Such a study would, however, be extremely relevant to this litigation; whether and to what extent there is a pattern of uniform restrictive terms in stadium leases could be evidence bearing on whether the NFL engaged in anticompetitive manipulation of stadium access.[32] Having made such a study as part of the USFL's start-up process, Paul, Weiss could

have an unfair advantage in this litigation as the NFL's counsel. Accordingly, disqualification is appropriate.

c. Corporate and tax work. A major difficulty with permitting Paul, Weiss to represent the NFL in this action arises from its corporate and tax work. It is clear that Dixon discussed his plans and ideas with attorneys at Paul, Weiss. Paul, Weiss argues that virtually every fact of substance that the USFL discussed with Paul, Weiss subsequently showed up in newspapers. (See Surreply Memo. at 13–14). Yet what this contention ignores is that at least *some* of the publicized facts are end products of a decisional process which necessarily involved consideration of underlying facts that did not appear in newspapers. For example, the fact that each prospective USFL owner was required to post a $1.5 million letter of credit appeared in the *Washington Post* on March 27, 1982 (Gitter supp. afft. Ex. A). However, where the $1.5 million figure comes from did *not* appear in the *Post*. Paul, Weiss incorporated that figure in its draft Subscription Agreement, along with other figures relevant to the initial financial commitments required of the prospective owners. To contend that the figures were conjured up without any study or consideration of underlying factors is incredible. The same applies to certain of the operational details covered in the draft Subscription Agreement. The same applies as well to consideration of the tax consequences of various league structures, both legal and financial. The reasons for setting up the USFL in a certain way with certain features would necessarily require disclosures to the attorneys who did the organizational work. Without such information they could not consider legal ramifications, give proper advice or draft papers that would be of any use. Attorneys do not and can not operate in the dark. They must be aware

---

**32.** It may be argued that the NFL obviously is in possession of its own leases, so that Paul, Weiss can not make "unfair use" of them. This argument fails once the importance of factual con-

text is recognized. The specific concerns of a client affect what a lawyer looks for. So it is the study of leases *from the USFL's perspective* that is the key here.

of how the client perceives the situation facing it.[33]

The viability of the USFL concept could be an important issue in this litigation. Facts which could reveal whether that concept was fatally flawed necessarily had to have been in Paul, Weiss's possession. The record bears out that there was frequent contact between USFL representatives and attorneys at Paul, Weiss throughout June and July, while the corporate and tax work was being done. It is reasonable to infer that confidential information as to the progress of the league founders' plans, or any glitches that might develop in those plans, would be reported to the attorneys. Conclusory denials of receipt of relevant confidences are thus unconvincing. Particularly in light of the narrow view Paul, Weiss takes of the issues presented in this litigation, *see supra* note 24, its claims that no "relevant" confidences were imparted are especially meaningless.

## C. *Transmission of confidences within Paul, Weiss.*

Even if disqualification of certain attorneys within the firm is warranted, Paul, Weiss argues, firmwide disqualification is inappropriate. The centerpiece of its argument here is the "Chinese Wall" erected within the firm immediately upon its acceptance of the NFL representation in order to prevent communication of any relevant information from the attorneys who worked on the USFL matter to Arthur Liman and the other attorneys representing the NFL. Paul, Weiss argues, not without some force, that at least in certain situations the Second Circuit authorizes use of screening procedures to avoid disqualification.

When one member of a firm is disqualified from representing a client because of his presumed possession of relevant confidences, courts apply DR 5–105(D)[34] to the disqualification situation, *see Cheng, supra,* at 1056, and presume that the confidences were transmitted within the firm to other attorneys. *See Silver Chrysler, supra.* The presumption of shared confidences is, however, rebuttable: the particular attorneys who will be working on the later adverse representation are permitted to prove that they were not privy to any of the former clients' confidences. *See Silver Chrysler, supra; Laskey Bros. of W. Va. v. Warner Bros. Pictures, Inc.,* 224 F.2d 824 (2d Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956).[35]

Plaintiffs argue that Paul, Weiss's attempts to rebut the inference are ineffective. The much-vaunted "Chinese Wall", they argue, is tantamount to closing the barn door once the cow has run out. Since no screen was in effect from 1981 to 1984,

---

**33.** It is evident from the nature and extent of the representation that more was involved than filling out forms and marking up documents used in prior transactions (*see* Washburn afft. Exhibits B, E). Thus some consideration of the factual context by the attorneys perforce was necessary.

As the Eighth Circuit wrote,

No set of canons are [sic] needed to establish the proposition that one offering services as a counselor must, if he would counsel well, receive full disclosure from the counseled. Indeed, a counselor at law is enjoined to probe deeply for all the facts, favorable and unfavorable, before counseling a particular course for his client.

*Arkansas v. Dean Food Prods., Inc.,* 605 F.2d 380, 385 (8th Cir.1979) *overruled on other grounds, In re Multi-Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.1980) (en

banc), *vacated,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).

**34.** "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate ... [in] his firm may accept or continue such employment."

**35.** The Seventh Circuit suggests several factors for a court to consider in deciding whether the presumption has been rebutted.

A district court, in resolving this issue, may ... rely on any of a number of factors, among them being the size of the law firm, the area of specialization of the attorney, the attorney's position in the firm, and the demeanor and credibility of witnesses at the evidentiary hearing [required by the Seventh Circuit].

*Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 723 (7th Cir.1982).

there is no telling what information travelled within the firm.

Paul, Weiss, on the other hand, contends that in the circumstances of this case, the presumption of free flow of information within the firm should not apply. Since Liman had represented Rozelle for a long time, it makes more sense to presume that those attorneys who performed services for the USFL did *not* communicate with him about the USFL representation.

The Second Circuit has in recent years expressed some receptiveness to using a screening procedure as an alternative to disqualifying former counsel. In *Armstrong v. McAlpin, supra,* the Second Circuit endorsed a screening procedure where: a single attorney had recently joined the firm after a tour of duty with a government agency; there was no real threat of taint because the firm would not be in a position to make unfair use of information; there were independent policy reasons not to mandate firmwide disqualification;[36] there was no reason to suspect any lack of vigor in the firm's representation of the present client traceable to ethical concerns; and the district court had determined that the single attorney could be effectively insulated. *See id.* at 445. It is conceivable that the Second Circuit would approve of a Chinese Wall in other circumstances as well.[37] *See generally* Note, *The Chinese Wall Defense to Law-Firm Disqualification,* 128 U.Pa.L.Rev. 677 (1980).

■ In this case, however, I need not speculate as to the conditions under which the Second Circuit would approve a Chinese Wall. The fact is that there is evidence in the record indicating that confidences about the USFL may well have passed within the firm before Paul, Weiss instituted its screen. As I noted above, Paul, Weiss argues that the usual presumption of shared information should not apply. Rather, it argues, because of the prior concurrent representations it makes more sense to say that in this case no confidences passed within the firm. Further, Paul, Weiss is a large firm, spread over a number of floors in two buildings. The firm's USFL file is located in a remote warehouse. Arthur Liman, the Paul, Weiss attorney who has been put in charge of the NFL representation, is a litigator, as are the other attorneys who will work with him, while most of the lawyers who worked on the USFL matter were in other departments. The combination of these facts, it is argued, rebuts the presumption that the USFL's confidences, if any, did travel within Paul, Weiss in general, and to Arthur Liman in particular.

There is, however, some indication in the record that reinforces the presumption of shared confidences. In his affidavit, Taylor states that he had represented NFL Commissioner Rozelle (Taylor afft. ¶ 17). This is significant for two reasons. First, it indicates that there were no real limits on communication within the firm, even between those who represented the USFL and those who represented Rozelle, since the *same attorney* was assigned to both clients. Second, contact between Taylor and Liman on Rozelle-related matters may be well-nigh inevitable; in cases of close contact, a Chinese Wall is bound to be ineffective.[38] The specter of inadvertent

---

**36.** The attorney in question had been a supervisor at the SEC while it was investigating the matter that gave birth to the *Armstrong* litigation. The Second Circuit was concerned that firmwide disqualification would "hamper the government's efforts to hire qualified attorneys" since prospective government attorneys may choose not to enter government service out of concern that private firms will avoid hiring them in the future in order to avoid firmwide disqualification. *Id.* at 443.

**37.** The Seventh Circuit, for example, has approved the use of Chinese Walls in lawyer-move-ment cases even where the "infected" attorney gained his presumed knowledge not during government service, but during the course of private practice at a different firm. The firm seeking to avoid disqualification by erecting a screen bears the burden of proving that such a procedure would be effective. *See Schiessle v. Stephens,* 717 F.2d 417, 421 (7th Cir.1983).

**38.** Indeed, the Second Circuit has expressed its concern that information would flow within the firm in the course of a concurrent representation even when a Chinese Wall has been in effect from the time the concurrent representa-

disclosure would lurk constantly in the background. *See Cheng v. GAF*, 631 F.2d at 1058. Thus, I must hold that the presumption has not been rebutted. Paul, Weiss must be disqualified.

## IV. CONCLUSION.

Holding members of the bar disqualified from representing their clients is a drastic, unpleasant step. It may well be that Paul, Weiss's hands are entirely clean in this affair. But to guard against the possibility that this litigation—which promises to be protracted and difficult—will be tainted, I must, on the record before me, grant the motion.

Defendants are instructed to procure new counsel within thirty (30) days of the issuance of this order. Their answer(s) shall be served within twenty (20) days thereafter.

**SO ORDERED.**

tion began. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 229 n. 10 (2d Cir.1977). A fortiori, in this case, where the wall was not put into place until three years after the concurrent representation, there is reason to surmise that information did travel among the attorneys in the firm.